**In re THE LESLIE FAY COMPANIES, INC., et al.**

**Bankruptcy No. 93 B 41724(TLB).**

United States Bankruptcy Court, S.D. New York.

Aug. 18, 1997.

Wisehart & Koch by Arthur M. Wisehart and Heather R. Boshak, New York City, for claimants.

McDermott, Will & Emery by Joel E. Cohen and Barbara Funt, New York City, for debtors.

## DECISION AFTER TRIAL ON EMPLOYEES' DISCRIMINATION CLAIMS

TINA L. BROZMAN, Chief Judge.

The Leslie Fay Companies, Inc. ("Leslie Fay"), a domestic clothing manufacturing company which has confirmed a plan of reorganization, objects to the claims of six former employees all of whom contend that they were the victims of one form or another of prohibited discrimination in regard to either or both the termination of their employment and Leslie Fay's failure to rehire them. Collectively, the claimants seek over $80 million in asserted administrative priority claims. These claimants are not alone in the ranks of the terminated, for over the course of four years, Leslie Fay let go some 3,700 employees, constituting two-thirds of its work force.

Claimant Elizabeth Michaud, who suffers from diabetes and hypertension, alleges that she was not promoted and suffered a series of discriminatory and humiliating acts deliberately inflicted upon her by her supervisor which made it impossible for her to perform her duties effectively or to remain in her position. She contends that she was thereby constructively discharged and suffered retaliation due to her gender and disability in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 *et seq.* (McKinney 1993), and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 *et seq.* (1996).

Jacob Falbaum, Anthony Gill, Lee Kishbaugh, Emile Lewkowiez and Raymond Terwilliger allege that their employment with Leslie Fay was terminated and they were not rehired because of their ages, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (1985), the New York State Human Rights Law ("NYSHRL"), article 15, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 955. In addition, Terwilliger claims that, in violation of the ADEA, he was terminated in retaliation for voicing objections to Leslie Fay's discriminatory employment practices.

## I.

### A. Background and Prior Proceedings

Leslie Fay, a Delaware corporation with its principal place of business in New York, was a publicly held company engaged in the design, manufacture and sale of diversified lines of women's dresses, suits, blouses and sportswear. It operated in two major divisions, its core businesses, called "Leslie Fay", and its "Sassco" division.[1] On April 5, 1993, precipitated by the discovery of certain "accounting irregularities," Leslie Fay and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code. Although the magnitude of the overstatement of its financial statements was not fully identified at the time of the filing, eventually the company restated its earnings for the years 1990, 1991, and 1992 to reflect income that was some $81 million less than had been originally reported. *See generally In re Leslie Fay Cos., Inc.,* 207 B.R. 764 (Bankr.S.D.N.Y.1997); *In re Leslie Fay Cos., Inc.,* 175 B.R. 525 (Bankr. S.D.N.Y.1994).

Leslie Fay continued to operate its business and manage its property as a debtor in possession. In due course, a final date for the filing of proofs of claim was fixed and the six claimants filed proofs of claim against the estate.

All of the claimants save Terwilliger worked in Leslie Fay's domestic manufacturing or distribution facilities in Pennsylvania. Terwilliger, who served as Leslie Fay's Vice President of Human Resources, was also based in Pennsylvania. Falbaum and Lewkowiez were terminated in August 1992, pursuant to a reduction in force ("RIF"); Terwilliger's employment was terminated the same month, but not pursuant to the RIF; Gill's employment was terminated in May 1992, not pursuant to an RIF; Kishbaugh was terminated post-bankruptcy in connection with the November 1993 closing of his factory; and Michaud retired on December 31, 1992. (Pre–Trial Order, Undisputed Facts at ¶¶ 4, 6, 8, 10, 13, and 16).

Under Leslie Fay company policy, an involuntarily terminated employee was not eligible for severance benefits unless he or she executed a release agreement waiving any and all claims against the company in connection with his or her employment or the termination thereof.[2] Pearson, Tr. 67 (October 11, 1995); Tully, Tr. 95–96 (Feb. 18, 1997); Silvi, Tr. 38–39 (Feb. 18, 1997). Leslie Fay offered Falbaum, Gill, Terwilliger, Kishbaugh and Lewkowiez the opportunity to obtain severance benefits in consideration for the execution of releases. Because Michaud retired, she was not offered severance and did not sign a release.

---

1. As a result of the confirmation and consummation of its plan of reorganization, Leslie Fay's two divisions were spun off into separate corporations owned by its creditors. Both entities would be liable for the payment of the claimants' asserted administrative claims, if they are sustained. General unsecured claims are payable through a combination of a small amount of cash and stock of both surviving entities.

2. Citations to testimony from the trial are designated as "[witness last name], Tr. [page number] ([date of testimony])." Where there was more than one witness with the same last name, the witness' first initial is also indicated. Exhibits admitted during the trial that were introduced by the Claimants are referenced as "CL's Ex. [number]" and those introduced by the Debtors are referenced as D's Ex. [number]. Where helpful, a brief description of the exhibit will follow the exhibit number. Exhibits admitted during the release hearing will be referenced as Release Hearing, Ex. [number].

Falbaum, Gill, Terwilliger and Kishbaugh executed releases by which they agreed to "release and discharge [Leslie Fay] from any and all charges, claims and actions arising out of [their] employment with [Leslie Fay] ..." Each of them received severance benefits. Kishbaugh's release was concededly invalid, although he has not returned the severance benefit in return for which he executed the release. Lewkowiez declined to sign a release and thus received no severance. Lewkowiez, Tr. 183–84 (Feb. 18, 1997) and Tr. 72 (May 28, 1997).

Despite their execution of releases, Falbaum, Gill and Terwilliger filed charges with the Equal Employment Opportunity Commission ("EEOC"), the New York State Division of Human Rights and the Pennsylvania Human Relations Commission against Leslie Fay and certain of its former officers and directors. Lewkowiez and Michaud did the same. While these charges were pending, those of the claimants who had by then been terminated filed their proofs of claim. Fourteen months later Kishbaugh, newly terminated, did so, too.

On February 14, 1995, Leslie Fay filed objections to the proofs of claims interposed by Falbaum, Gill and Terwilliger on the ground that the claims arising before or out of their terminations were barred by the assertedly valid releases which they had executed. I ordered the proceedings bifurcated so that the merits of the discrimination claims would not be tried until the issue of the binding effect of the releases was first determined. I conducted a trial on that limited issue on October 11, November 27, and December 11, 1995 and January 16, 1996. On January 24, 1996, I read into the record my decision upholding the validity of the releases. By order dated February 7, 1996, I expunged the pre-termination and termination-related claims of the three claimants. Needless to say, perhaps, the release portion of the claims objection hearing constitutes

part of the record here. In any event, the parties stipulated that the testimony taken and exhibits admitted into evidence were deemed a part of this record.

The releases aside, Falbaum, Gill and Terwilliger all contend that Leslie Fay did not rehire them because of their ages. Inasmuch as those claims allege discriminatory acts separate and distinct from their employment and termination claims and were not encompassed within the releases, they are not barred. See 29 U.S.C. § 626(f)(1)(C).

Although Kishbaugh's release does not comport with the mandatory requirements of the Older Workers Benefit & Protection Act ("OWBPA"), 29 U.S.C. § 626(f), the 1990 amendment to the ADEA, Leslie Fay nevertheless contends that Kishbaugh may be said to have ratified the release, or, stated differently, to have waived the protections of the OWBPA, because he failed to tender back the severance benefits he received under the release agreement.

On the eve of the hearing to consider approval of the joint plan of reorganization filed by the debtors and the Official Committee of Unsecured Creditors, Leslie Fay filed objections to the claims of Kishbaugh, Michaud and Lewkowiez. Because there was insufficient time before the scheduled confirmation hearing to ready the balance of the matters for trial, I held an estimation hearing on February 18 and 19, 1997, with regard to all of the claims except Michaud's. Its purpose was to enable me to determine whether the plan had been accepted and whether it was feasible.[3] I indicated that my factual findings would have no preclusive effect at trial although any legal principles decided would be binding. See In re Ralph Lauren Womenswear, Inc., 197 B.R. 771, 775 (Bankr.S.D.N.Y.1996) (in estimating claims, bankruptcy court may use whatever method is best suited to the circumstances of the case). Among the legal determinations which I made was that the claims asserted by

---

**3.** The claimants sought $80 million in administrative priority claims. If valid in amount and priority, the claims would have rendered the plan unconfirmable because administrative claims must be paid in full on the effective date of the plan or as otherwise agreed by the individual administrative claimants. On the other hand, if the claims were not priority claims but general unsecured claims valued at $80 million, the negative vote of the claimants could have defeated the plan. This state of affairs mandated that I fix a value and, for those with value, priority for the claims prior to considering confirmation of the plan.

Gill, Terwilliger, Lewkowiez, and Falbaum were all general, unsecured claims. (I did not deal with the priority of Kishbaugh's claim because I had estimated its value at zero.) Subsequently, the parties commendably stipulated to admit into evidence all of the testimony and exhibits from the estimation hearing. The remaining testimony was adduced and evidence received during the trial held on May 28 and 29, and June 9, 16, and 23, 1997.

## B. *Leslie Fay Reduces Its Work Force*

In the early 1990s, Leslie Fay's so-called Dress Group (which is part of the core "Leslie Fay" businesses) maintained substantial domestic manufacturing operations in Pennsylvania, including factories, a distribution center and independent contractor shops which produced some of its goods. The Dress Group's design staff, technical services personnel, and sales and materials management were headquartered in New York. All of the plaintiffs except Terwilliger were employed in the Dress Group. Terwilliger was a senior executive with duties regarding all of Leslie Fay's operations.

In the spring of 1991, Sanford Mazur, Leslie Fay's most senior executive in charge of manufacturing, had fallen ill and announced his intention to retire. While he was recuperating, Leslie Fay hired Max Weinstein (age 43) as Senior Vice President of Operations for the Dress Group. Mazur remained with the company for a time thereafter. John T. Cawley (age 57), who had been with Leslie Fay some 40–odd years and was Mazur's right-hand man, was the Vice President of Domestic Manufacturing, running the manufacturing plants. When Weinstein arrived, Cawley began reporting to him. Late that year, Weinstein, part of whose mandate was to revamp the Dress Division, determined to lay off approximately 18 people. That trickle later grew into a flood.[4]

In the spring of 1992, when Leslie Fay employed approximately 5,648 people in its domestic divisions, the Chairman of the Dress Group informed Weinstein that, as a result of a decline in sales volume, overhead would have to be further cut. Weinstein, Tr. 9 (Oct. 11, 1995). Weinstein undertook in earnest consolidating domestic manufacturing operations with an eye toward achieving greater efficiency and cost savings. *Id.* Tr. 277–78 (May 29, 1997). This meant more layoffs would occur.

Terwilliger was the chief witness for the claimants attesting to the age-biased animus driving the layoffs in Pennsylvania. He testified that before Weinstein was hired Leslie Fay's policy during layoffs was to terminate according to length of service and qualifications ("skills and seniority"). *See also* Ex. 65. Leslie Fay historically reassigned people to different functions based upon their broad experience in the industry. Terwilliger, Tr. 949 (June 23, 1977); L. Kishbaugh. Tr. 664 (June 16, 1997). Terwilliger commented that this changed under Weinstein. At Cawley's direction, the department heads of the different facilities compiled a list of people to be targeted for the necessary August 1992 RIF. After the list had been prepared, Robert Silvi, the Dress Group's Human Resources Manager, was directed by Weinstein to add more younger names to the RIF list; Cawley supplied the additional names. Silvi, Tr. 108–115 (May 28, 1997); Weinstein, Tr. 11 (Oct. 11, 1995). The consolidations and the RIFs which implemented them affected employees of all ages and all levels within the organization, union and nonunion. *See* Ex. B; Release Hearing Ex. D4; Weinstein, Tr. 10, 12–13, 39 (Oct. 11, 1995). As part and parcel of this new strategy, Leslie Fay also increased emphasis on imports. Weinstein, Tr. 284 (May 29, 1997).

Although Terwilliger suggested otherwise, at least three of Leslie Fay's former employees who were responsible for administering the RIFs testified that they were not instructed to discharge older workers nor were they told that older workers should be targeted for termination. Cawley, Tr. 18–19

---

**4.** By 1993, the Dress Group terminated 500 employees. D's Ex. B. By 1994, the Dress Group terminated an additional 976 employees. *Id.* By 1995, the Dress Group terminated another 644 employees. *Id.* By 1996, the Dress Group cut a very substantial portion of its work force, 2,361, leaving only 752 persons in its employ. *Id.* The bulk of the layoffs occurred after Leslie Fay filed for chapter 11 relief.

(Feb. 18, 1997); Silvi, Tr. 43–44 (Feb. 18, 1997); Gordon, Tr. 66–67 (Feb. 18, 1997). This testimony was confirmed by Roger Vallecorse, who worked in the Human Resources department beginning in the year prior to Terwilliger's departure and eventually replaced Terwilliger. Cl.'s Ex. 76, Deposition of Vallecorse, at 68 (July 5, 1995). Weinstein testified that he allowed the persons with the knowledge of the employees to select those to be terminated. Weinstein, Tr.10, 39–40 (Oct. 11, 1995); Tr. 312 (May 29, 1997).

Silvi explained that, although he had never been directed to add names before, it was his general understanding as a human resource manager that it was an acceptable procedure to review layoff lists to ensure they were in compliance with the law. Tr. 119–121, 130 (May 28, 1997). Vallecorse testified that when RIFs were being implemented ages of employees were always discussed. Cl.'s Ex. 76 (July 5, 1995).

Terwilliger, who had not objected to the original August 1992 RIF list, objected to the instruction to add more younger people, warning Cawley that to do so could cause later problems. Terwilliger, Tr. 266–69, 290 (Nov. 27, 1995); Cawley, Tr. 136–39 (May 28, 1997). He also voiced his concern to Alan Golub, Leslie Fay's then President, who assured Terwilliger that if outside counsel, Michael Thrope, okayed the course of action that Terwilliger shouldn't worry about it. Terwilliger, Tr. 223 (Nov. 27, 1995). Terwilliger acknowledged that the August 1992 RIF list, pursuant to which both Lewkowiez and Falbaum were terminated, was amended several times.

Neither the drafts nor the final August 1992 RIF list are available, leading the claimants to conclude that the missing documents must contain information damaging to Leslie Fay. Silvi testified, however, that draft layoff lists are not maintained by the company; only the implemented, final lists are. Although Leslie Fay's witnesses testified as to their efforts to locate the final August 1992 list, they simply could not find it. Pearson, Tr. 85–89 (Oct. 11, 1995); Tr. 168–171 (May 28, 1997); Silvi, Tr. 49–50 (Feb. 18, 1997), Tr. 105–121 (May 28, 1997).

A word about credibility is a necessary departure from the chronology. I found the testimony of Silvi, Cawley and Gordon to be straightforward and credible. Vallecorse testified through admission of his deposition, so I did not have the opportunity to observe him, however, his testimony appears to have been quite candid regarding Leslie Fay's shortcomings. Weinstein, too, was a credible witness. Terwilliger, however, was less so. As I observed during the release portion of this trial, Terwilliger told conflicting accounts of events, answered questions evasively and had significant lapses in memory. As will become apparent as I recount the facts, Terwilliger continued his practice of contradicting himself. For the most part, I have discounted his testimony except when it was independently confirmed.

The manufacturing facilities were phased out over time with some being consolidated into other plants and afterwards closed outright. The consolidation of Leslie Fay's domestic manufacturing facilities and the implementation of RIFs continued during the bankruptcy period until August 1, 1995, when the last of the domestic factories was closed and substantially all of the remaining manufacturing employees were terminated, with the exception of certain quality control personnel. Cawley, Tr. 6–8 (Feb. 18, 1997); Tully, Tr. 100–01 (Feb. 18, 1997). Leslie Fay continues to operate its distribution center in Laflin, Pennsylvania, from which it distributes the merchandise which it imports. Id. 27–28. Leslie Fay thus uses its remaining work force primarily for quality control and distribution of imported goods.

### C. Investigation of Alternatives to Importing Goods

Before Leslie Fay decided to shut down all domestic manufacturing, its engineering department began investigating the viability of a "unit production system" as a way to make domestic manufacturing more profitable. The claimants assert that Leslie Fay could have manufactured profitably in the United States utilizing a unit production system but the company chose instead to close the factories to mask its scheme to rid Leslie Fay of older workers. In support of this theory the

claimants turn to the testimony of Nina Kishbaugh, plaintiff Kishbaugh's wife, who is a former Time Study Production Engineer for Leslie Fay. Ms. Kishbaugh testified that a study she and others in the engineering department conducted showed that Leslie Fay could have manufactured domestically at a profit had they implemented a unit production system. N. Kishbaugh, Tr. at 740–41 (June 23, 1997). She admitted, however, that her study was historical in viewpoint, not containing projections as to what future operations might produce. She also admitted that Leslie Fay did not simply reject the concept of a unit production system; rather the company conducted another internal study on the profitability of domestic manufacturing before concluding that such operations had to be abandoned. That study showed that the savings attributable to the use of the unit production system were not sufficient to enable Leslie Fay to continue its existing operations under the labor contracts it had then in force. N. Kishbaugh, Tr. 793–94 (June 23, 1997). Ms. Kishbaugh recalled that when Cawley had learned of the results of her study he commented that it was "too bad that Leslie Fay had not started the unit production system earlier." In light of this testimony, I do not believe that Leslie Fay engaged in an elaborate ruse to close the factories so as to get the older employees off its payroll.

The claimants also suggest that Leslie Fay's destruction of the engineering department's reports in the last two weeks of July 1995 prove that Leslie Fay was covering up the fact that domestic manufacturing could have been profitable but for Leslie Fay's decision to terminate all of its experienced workers in order to facilitate the elimination of older employees. However, Ms. Kishbaugh admitted that *all* of the documents that the engineering department had accumulated over the prior eighteen to twenty years had to be destroyed because the information contained within them was not for the general public and the manufacturing facilities as to which they pertained were closing. N. Kishbaugh, Tr. 730–31 (June 23, 1997). Moreover, the documents were not destroyed until Route 315, the last facility to close, was shut down. There is absolutely no suggestion from that evidence that Leslie Fay was destroying files in order to hide any RIF list or the results of Ms. Kishbaugh's study.

### D. The Consolidation of Functions and Closing of the Manufacturing Plants

Around the time that the 1992 downsizing began, Leslie Fay's Dress Group operated out of eight manufacturing or distribution facilities in Pennsylvania—"Downing Garment," "Ricky Fashions," "Andy Fashions," "Pittston," "Kingston," "Laflin," and "Throop." The main facility was located at "Route 315." Each manufacturing facility was run by a factory manager. The six managers and their ages in 1992 were: (i) Joseph Bachkosky (age 40; hired 1974) managed Ricky Fashions; (ii) Kishbaugh (age 52; hired 1976) managed Downing; (iii) James McGavin (age 33; hired 1980) managed Pittston; (iv) Phil Marino (age 33; hired 1981) managed Throop; (v) Ron Pitcavage (age 49, hired 1984) managed Kingston; and (vi) Tommy Gill (age 50+ and plaintiff Gill's brother) managed Andy Fashions. The following other managers were also in place in 1992: Gill (age 57; hired 1978) was a production manager; Falbaum (age 53; hired 1977) was the number two person at the distribution center at Laflin; and Lewkowiez (age 56; hired June 1984) headed up quality control, a job which required oversight of manufacturing at all of the factories.

As Leslie Fay consolidated functions and operations to reduce overhead it also put greater emphasis on importing lower-cost garments. Weinstein, Tr. 278 (May 29, 1997); Granahan, Tr. 194 (May 28, 1997). This, in turn, caused two significant operational changes. When garments were imported, it was necessary to exercise efficient "quality control" to ensure that they met specified criteria before Leslie Fay shipped them out to customers. Weinstein implemented a new audit system employing "statistical sampling" of finished garments to expedite the flow of merchandise to customers. Leslie Fay's "examiners"[5] would now

---

**5.** "Examiners" look at completed garments be- fore they are shipped, weeding out those which

test certain predetermined percentages of every cut of finished garments. Previously Leslie Fay had tested 100% of the first (and sometimes second) cut of each style and subsequent cuts were then passed through. However, with large shipments of imported garments arriving all at once, the old method could not be performed efficiently. Weinstein, Tr. 278, 283–84; Granahan, Tr. 200, 283–285 (May 28, 1997).

The second change which Weinstein instituted to accommodate the increase in imports was to move quality control for domestic manufacturing out of the distribution center and into the manufacturing plants. Rather than focusing on quality control for domestic manufacturing in the now over-burdened Laflin facility where the product was to be bagged, tagged, and prepared for shipping, Weinstein emphasized catching the quality control problems right at the manufacturing plants before the garments ever reached Laflin. Weinstein instructed the plant supervisors and quality control people who were already employed at the plants that they would now have responsibility for their own quality control. Weinstein, Tr. 285 (May 29, 1997). This change did not bode well for Lewkowiez.

When he was making decisions regarding the consolidation of functions, Weinstein concluded that Lewkowiez's position and input into the creation of manufacturing specifications was a luxury that Leslie Fay could no longer afford. Weinstein, Tr. 277–78 (May 29, 1997). Thus Leslie Fay terminated Lewkowiez in August 1992 as part of the RIF. Weinstein explained that almost seventy percent of Lewkowiez's job was spent at the Route 315 facility working with the manufacturing people in order to edit the production techniques, suggest alternative methods of manufacturing, and create the documentation that would be the guideline to the factories for putting garments together and determining what tolerances to provide. Weinstein, Tr. 278–89 (May 29, 1997). As he contemplated methods of shaving cost, Weinstein realized that Lewkowiez's functions

could all be and, to a large extent already were being, performed by Cawley, Fred Wesstrum (the Chief Engineer), and the production pattern makers, specification technicians, engineers and costing personnel who were all involved in the process.

Cawley testified that the six or eight people who had reported to Lewkowiez began to report to the production head for each division, who in turn reported to Cawley. When Lewkowiez was terminated, Leslie Fay promoted Joseph Guarilia (age 57) to manage the examining function at Laflin. Plaintiff Michaud, the examining supervisor, was passed over in the process, to her great consternation. Guarilia then reported to a production person named Lee Granahan (age 36), who had been with Leslie Fay since 1974. Within a year or two Granahan was laid off. Leslie Fay rehired him for a low-level distribution position in 1977, where he worked his way up to more senior positions until 1990, when he left voluntarily to work for Liz Claiborne. Plaintiff Falbaum, to whom Granahan reported at the time he left, re-recruited Granahan later that year and gave him the Production Manager position which he held at the time Lewkowiez was terminated. Falbaum asked Granahan to return because of Granahan's qualifications and not because of his age.

In November 1992, as part of its consolidation strategy, Leslie Fay moved Ricky Fashions up to Route 315. Joe Bachkosky (who was then 40), its manager with 14 years' experience (and who had been at Leslie Fay for 18 years), was not terminated, but transferred to Route 315 with his staff. Ex. G, Tr. 660 (June 16, 1997).

In early 1993, Gordon, Leslie Fay's in-house counsel, advised Leslie Fay that he would be retiring at the end of the year. Vallecorse was also leaving. With continued cost-cutting in mind, Leslie Fay decided to consolidate its human resource, shareholder relations, and legal functions and employed an executive search firm to locate an appropriate candidate to fill all three jobs. The firm turned up Katherine Connors, who was

---

have defects. This is in contradistinction to the "quality control" function which aims to define acceptable parameters for garments before they are manufactured and to enforce fidelity to those specifications before the garments are delivered for shipping.

employed at Liz Claiborne, and Leslie Fay successfully recruited her to Leslie Fay on August 1, 1993. Connors, Tr. 376 (May 29, 1997). She was the first of numerous Liz Claiborne alumni hired by Leslie Fay.[6]

With its new dependence on importing, Leslie Fay hired Don Ochs (age 52) in October 1993 to head up production as Senior Vice President of Worldwide Sourcing. Prior to joining Leslie Fay, Ochs had been employed at a similar position at Liz Claiborne; he thus brought experience which was lacking at Leslie Fay. Throughout 1993 and 1994, Ochs recruited Mary Siercho (age 41), Katherine Bini (age 48), Don Ciley (age 48), Dick Hastings (age 57), Dan Liedy (age 49), Amr Fahmy (age 31), and Keith Farrell (age 37), people with whom he had worked at Liz Claiborne. Terwilliger testified that Leslie Fay often became enamored with recruiting people from other successful businesses with their affiliations becoming paramount in hiring decisions. Lewkowiez acknowledged that this type of recruiting was not unusual for the industry; Falbaum admitted that he had entered Leslie Fay's employ in a similar manner.

By August 1993, Leslie Fay decided to close most of the domestic manufacturing factories and bring operations into the main Route 315 plant one by one. L. Kishbaugh, Tr. 213 (Feb. 18, 1997). Leslie Fay told Kishbaugh of its plan and further that Downing Garment, Kishbaugh's factory, would be the first to close. Leslie Fay also informed him that no factory managers would be transferred.

Kishbaugh's factory closed on November 12, 1993; the 53 year-old Kishbaugh, with 16 years' experience as a Leslie Fay factory manager, was terminated. Downing Garment's non-management work force was combined with Ricky Fashions', and Leslie Fay kept Bachkosky, the 41 year-old manager who had been employed at Leslie Fay two years longer than Kishbaugh. Cawley explained that this was done because Bachkosky was the plant manager of Ricky Fashions, the largest of the plants. Cawley, Tr.

14–15 (Feb. 18, 1997). Bachkosky had the most experience in operating a large factory, which was important given that the combined facility was even bigger than Ricky Fashions.

One month later, Leslie Fay closed Andy Fashions and moved operations up to Route 315. Leslie Fay terminated Andy Fashions' manager (age 50+). With Andy Fashions now included in his responsibilities, Bachkosky was "spread very, very thin" and could not handle all the functions. N. Kishbaugh, Tr. 760–61 (June 23, 1997).

Having learned that Bachkosky could not oversee all the transferred operations, when Weinstein closed the next plant (Pittston) in early February 1994 he did not terminate the factory manager, James McGavin (age 40), but instead transferred him to Route 315. Tr. 642 (June 16, 1997); 761 (June 23, 1997). Pittston was the same size as Andy, which had been closed two months before. Kishbaugh, Tr. 237 (Feb. 18, 1997). McGavin then headed up the now-combined Pittston/Andy Fashions division (which removed Bachkosky from responsibility for Andy Fashions). To further assist Bachkosky by supervising the Downing employees, in March 1994 Leslie Fay also hired Annmarie Murphy, a woman in her early forties who had been a supervisor from an outside contract shop. Tr. 774 (June 23, 1997). Although McGavin had fewer years' experience and a little less seniority than Kishbaugh, he was familiar with the Pittston management and staff who were transferred to the combined facility.

When Kishbaugh heard that McGavin had been transferred, contrary to the information given to him that factory managers would not be retained as their factories were closed, he reapplied to Leslie Fay in March 1994 for the Factory Manager position of Pittston/Andy Fashions. Cl's Ex.5. He never received a response.

In the Spring of 1994, during the bankruptcy, Leslie Fay's union employees went on strike, staying off the job for 40 some-odd days. Marino and the other management

---

**6.** Granahan was rehired first, but his stint with Liz Claiborne was very brief; the great majority of his working years were spent at Leslie Fay.

employees from his factory (Throop) filled in for striking workers at Laflin. He and his non-union supervisory employees did whatever needed doing; in that manner, Marino obtained hands-on examining experience. N. Kishbaugh, Tr. 695 (June 16, 1997). Leslie Fay did not reopen Throop after the strike ended. This had salutary consequences for Marino (age 35), for instead of being terminated he was transferred to Laflin along with at least three of the other management employees from Throop. The function which he performed at Laflin was entirely different from his job at Throop, however. He became the head of quality control based on his newly-acquired skills combined with his many years of experience as a plant manager. Cawley, Tr. 141, 163 (May 28, 1997).

Several months later, in December 1994, Leslie Fay closed Kingston, and Ron Pitcavage (age 51), the factory manager who had had some 20+ years' experience as a factory manager, was terminated. By August 1995, Route 315 closed and Bachowky, McGavin, Cawley, and Ms. Kishbaugh were all terminated. Cawley, Tr. 27–28 (Feb. 18, 1997); Tully, Tr. 100–01 (Feb. 18, 1997). Weinstein had also been let go in the fall of 1994; Ochs on February 10, 1995; Leidy on March 20, 1995; Farrell on June 20, 1995; Sierchio and Fahmy on July 21, 1995; and Ciley on July 28, 1995. In fact, all of the factory managers except Marino and all of the staff that Ochs had hired were eventually terminated, except Bini (age 50), who continues as the Vice President of Piece Goods Purchasing. Marino remains as the Quality Control Manager.

Because the circumstances of the six claimants require individual examination, I turn to the facts more specific to each of them.

### E. Facts Specific to Each of the Claimants

#### 1. Lewkowiez

Emile Lewkowiez was 56 when Leslie Fay terminated him from his position as the Director of Quality Control for the Dress Division on August 5, 1992. Originally hired by Terwilliger in July 1979 for another position (at age 43), Lewkowiez left Leslie Fay to move elsewhere with his family in June 1980.

Some years later, he returned to Leslie Fay (at age 48) when Terwilliger hired him for the quality control directing position pursuant to a written offer of employment dated May 30, 1984. D's Ex. I. At that time, Mazur allegedly assured Lewkowiez that he would have tenure and would only be fired for cause. However, the offer letter, which was signed by Terwilliger and provides Lewkowiez with various perquisites, contains no representations by Leslie Fay that Lewkowiez was being offered "career employment" or that he could only be fired for cause.

Claiming that Leslie Fay terminated and failed to rehire him because of his age, Lewkowiez points out that younger, less qualified persons were retained or hired in the area of "quality control," and that those persons who had formerly reported to him now reported to Granahan, who was in his 30s. Tr. 12, 30, 854; Exs. 15, 57. Lewkowiez was mistaken regarding Granahan. Whereas the people at the Laflin facility (like Michaud) who had reported to Lewkowiez now reported to Granahan, the other employees who had reported to Lewkowiez began reporting to the production heads at each of their own facilities. *See* Cawley, Tr. 27 (Feb. 18, 1997). Cawley testified that although Lewkowiez was "very talented," his position was eliminated as a result of the downsizing, and no one was hired to replace him. Cawley, Tr. 278–79 (May 29, 1997); *see also* Silvi, Tr. 43 (Feb. 18, 1997). Lewkowiez's function did not embrace the "examining" aspects of quality control, although the examining supervisor, at least for a time, reported to him. Rather, Lewkowiez assured quality control in the manufacture of goods from their inception. Consistent with this focus and recognizing that the future in manufacturing was overseas, Lewkowiez had informed Cawley in February 1992 that he was interested in an available position as Quality Control Manager for Leslie Fay in Indonesia. Cawley responded that Lewkowiez was much too valuable in Wilkes–Barre and that Wilkes–Barre was the best place to stay. Lewkowiez, Tr. 179 (Feb. 18, 1997). As it turned out, Cawley's son, John (age 32), got the Quality Control job in Indonesia in June 1992, just two months before Lewkowiez was terminat-

ed. Lewkowiez provided a lengthy analysis, well supported by other testimony, that he was indeed the better choice for the Indonesian position. However, Lewkowiez admitted that age was not the motivating factor—he believes John Cawley got the job not because of his youth but because his father was Jack Cawley. Terwilliger and Kishbaugh both confirmed this. *See* Lewkowiez, Tr. 197–98 (Feb. 18, 1997), 83–85 (Feb. 19, 1997); Kishbaugh, Tr. 213, 241 (Feb. 18, 1997); Terwilliger, Tr. 85 (Feb. 19, 1997). A relatively brief time later, Leslie Fay closed the Indonesian plant and terminated John Cawley.

A few months after Lewkowiez's termination, in October 1992, Weinstein informed Lewkowiez that Leslie Fay was trying to find another position for him and would continue to do so. Cl's Ex. 31. It is not clear what Weinstein intended or what Lewkowiez perceived this statement to mean. Lewkowiez could not have put too much stock in it because, a month later, Lewkowiez requested and Leslie Fay provided a letter of recommendation to him. Lewkowiez was unemployed for approximately eight months. In February 1993, Lewkowiez was hired as the quality control director for a company in Florida, where he remains today. However, shortly after securing that position, Lewkowiez received an offer from Liz Claiborne in New Jersey which would have paid him a higher annual salary than what he was receiving at Leslie Fay. Lewkowiez, Tr. 101 (May 28, 1997). After assessing the financial pros and cons, including the tax ramifications, of moving back to the northeast, Lewkowiez declined the Liz Claiborne offer.

Lewkowiez maintains that he should have been offered reemployment for the positions made available to Farrell, Marino, and Ochs. Lewkowiez nonetheless contends that he was qualified for Ochs' position in light of Lewkowiez's performance of production functions at other companies and for his current employer, a position which requires visits to factories around the world. Lewkowiez, Tr. 74–75 (May 28, 1997). Lewkowiez recognized, however, that Ochs had more qualifications, having been employed in one of the major apparel companies in the United States as a chief of production in charge of worldwide sourcing.

Keith Farrell (born May 16, 1957, age 37) was one of the employees hired by Ochs in April 1994. Ochs named Farrell Director of Quality Control, the same title which Lewkowiez had held. Connors testified that Farrell was recruited for two reasons: (i) because of Ochs' prior relationship with Farrell at Liz Claiborne and (ii) because of Ochs' belief that Farrell, who had worked at J.C. Penney, could assist Leslie Fay in obtaining that company as a client. Connors, Tr. 367–69 (May 29, 1997). Notwithstanding the like title, Farrell's position was actually quite different from Lewkowiez's. Farrell's position was more along the lines of an examining supervisor's, like Michaud's, rather than like Lewkowiez's, who was more focused on quality control in the manufacturing stages. Cawley, Tr. 24–25, 30 (Feb. 18, 1997). Ms. Kishbaugh confirmed this. Notwithstanding that Lewkowiez was probably qualified for the position that Farrell held, he never indicated a desire to perform lesser functions when he was laid off or at any time thereafter. Phil Marino, to whose job Lewkowiez says he was entitled, later replaced Farrell when Marino's factory did not reopen after the 1994 union strike.

### 2. Falbaum

Plaintiff Falbaum was hired by Leslie Fay in March 1977 (at age 38) and was terminated on August 7, 1992 (at age 53) as part of an RIF. At the time he was terminated, Falbaum was the Director of Physical Distribution for the Dress Division working out of the Laflin facility. Falbaum, Tr. 307 (Nov. 24, 1995). He was responsible for the movement of goods, which entailed directing operations at the warehousing and distribution center. Because Falbaum executed an enforceable release, his only surviving claim is for discriminatory failure to rehire.

When Leslie Fay terminated Falbaum, Weinstein volunteered that Falbaum would be considered for future positions within Leslie Fay and further that Weinstein would try to get Falbaum a job elsewhere. In response to a letter from Falbaum expressing dissatisfaction with the severance benefit

proposed by Leslie Fay, Weinstein wrote, "Incidentally, we have been trying to find a position for you and we will continue to do so." Ex. 14.

There were two available factory manager positions in 1993 for which Falbaum was qualified. In early 1993, Sassco had an opening to run its warehouse facility in Secaucus. Lester Schreiber, the Chief Executive Officer of Sassco, testified that Falbaum never applied for the position, but, in any event, Schreiber was not interested in hiring him. Several years earlier, in 1990, Falbaum had applied for a position with Sassco. Schreiber interviewed him, forming the impression that Falbaum wasn't completely effective in dealing with subordinates. Schreiber says that Falbaum seemed preoccupied with his ability to hire and fire rather than with his major function, distribution. Schreiber also says his impressions were confirmed by Terwilliger, testimony which I also believe, notwithstanding Terwilliger's attempt to dance around this issue.

Terwilliger's assessment of Falbaum's difficulties with his subordinates was corroborated by an undated memorandum from Sandy Mazur to Falbaum, a copy of which Mazur had supplied for Falbaum's personnel file. (Mazur retired at the end of 1991, so the memorandum has to have been sent no later than that time.) The memorandum is quite critical of Falbaum, recognizing that while he worked long hours, he was not managing the department. Mazur stated that "Your people not only have no respect for you, but every one of the supervisors feel you are of little or no help to them. To speak to you of a problem results in no action. You don't really know what is going on in the department. You don't know how to solve problems. . . ." Debtors' Ex. J.

The accuracy of Falbaum's account of his application to Sassco in early 1993 is questionable. His suggestion that he did not get the job in 1993 because of his age is equally problematic. Falbaum testified on direct examination that he had heard through the "grapevine" that Sassco needed a factory manager so he mailed a resume and attempted to reach Schreiber by telephone. He later identified his "grapevine" as Ron Kalman, the director of corporate engineering. Falbaum described Kalman's job as encompassing visits to all of Leslie Fay's facilities, giving Kalman a pulse on what the company's hiring needs were. However, when pressed on cross examination about whether he was perhaps mistaken about how he heard of the 1993 Sassco position in light of the fact that Kalman had actually left the company two years earlier, Falbaum steadfastly held to his story. He said that notwithstanding Kalman's departure, Kalman was still "in the know," an unlikely proposition at best. Falbaum also testified that after he had sent Schreiber his resume in 1993 and had not heard from Sassco, Kalman informed him that Sassco "would not touch [him] with a ten foot pole" because "he was Leslie Fay." Falbaum explained that Sassco's principals were untrusting of Leslie Fay people. (Even if true, this has nothing to do with age discrimination).

Falbaum's reaction to the critical memorandum from Mazur was also less than credible. He testified that he "probably" never received it from Mazur and that Mazur always sent "love notes" like that to people, so that it shouldn't be given too much weight. Terwilliger attempted to stand the memorandum on its head, suggesting that the import of it was that Mazur was concerned that Falbaum was working too hard. This, as much as anything Terwilliger said, illustrated his willingness to shade his testimony to achieve an objective, leading me yet again to question his truthfulness. Significantly, Falbaum admitted that he left his post-Leslie Fay position with Maidenform because they were unhappy with how he dealt with labor problems, lending substance to Schreiber's instinct about not hiring Falbaum for Sassco and to his testimony about what Terwilliger had said regarding Falbaum.[7]

The second opening for a factory manager position became available when Galen Erickson, who had been brought in over Falbaum,

---

7. As it so happens, Schreiber hired an individual for the position who was the same age as Falbaum. Schreiber, Tr. 92 (Feb. 18, 1997).

resigned from his position in August 1993. The debtors concede that Falbaum had the experience for this position but, rather than rehiring Falbaum (age 54), Leslie Fay transferred an existing employee, Robert Sink (age 49), from its Hanover facility. Cawley, Tr. 162 (May 28, 1997). Sink, who was five years younger than Falbaum, was not in distribution before his transfer. Terwilliger testified that Leslie Fay made it a point to move people internally to different jobs and operations based upon their broad understanding of the apparel industry, and Sink's transfer is consistent with this policy. *See* Terwilliger, Tr. 137–38 (Feb. 19, 1997). Sink was terminated in October 1995, and Granahan (then age 40), promoted from within, is now running the facility. Granahan had worked for Falbaum twice and was trained in part by Falbaum.

### 3. Gill

Anthony Gill was hired by Leslie Fay in the summer of 1978 (at age 42) and terminated June 6, 1992 (at age 57). Gill, Tr. 165 (Nov. 27, 1995). At the time of his termination, Gill was a Production Manager at Albert Nipon, then a division of Leslie Fay. He reported to Mazur, the Vice President of Manufacturing. Gill's position was eliminated when Leslie Fay consolidated Albert Nipon with three other divisions and retained the Production Manager of those divisions, who had more seniority than Gill. Cawley, Tr. 152–56 (May 28, 1997); Gill, Tr. 425 (May 29, 1997). (One year later, the combined division was closed.)

Gill's function was domestic "sourcing," which meant that he searched out independent contractor factories to produce a quality product and then priced the garment. Gill was "exceptionally" qualified and a valued employee at Leslie Fay. Cawley, Tr. 147 (May 28, 1997), Cl's Ex. 41. In January 1992, he had been given a raise.

Gill's qualifications were not limited to production, for Gill had spent some time in the specialty needle and fusing department which he had successfully revamped. Gill, Tr. 232 (May 28, 1997); Cawley, Tr. 147 (May 28, 1997). In 1988 or 1989, Gill was transferred from the specialty department because his job there had been completed. No one was hired to replace him because all the new methodology was in place. Gill, Tr. 433 (May 29, 1997). The supervisors whom he had overseen remained in their positions when Gill was transferred to the Nipon division; those supervisors were later terminated as Leslie Fay downsized. Tr. 429, 431, 435 (May 29, 1997).

As mentioned above, Gill has waived any claim for wrongful termination. Thus his employment discrimination claims subsist only to the extent that he was discriminated against in his attempt or right, if any, to be rehired.[8] Gill, who is quite ill, has not secured any comparable position to those which he held at Leslie Fay; rather, he has done part-time freelance domestic sourcing.

Gill testified that when he was terminated from his production manager position in June 1992, Cawley assured him that if any position became available, Gill would be considered. Cawley denies promising Gill future employment. About a week after he was terminated, Gill spoke with Mazur, whom he says also assured him that if any subsequent position became available, Gill would be considered. Terwilliger, who was still Leslie Fay's Vice President of Human Resources at the time, informed Gill that something should be able to be done for him. About a month later, Mazur then informed Gill that he was sorry but "they want you out." Since then, Gill has communicated periodically with Mazur. Later in 1992, Mazur suggested that Gill send in his resume again, although Mazur did not indicate that any positions were available.

---

**8.** In the Claimants' *reply* post-trial memorandum, Gill attempts to reargue the merits of his claim that the release he signed violated mandatory provisions of the ADEA in light of facts which he says were developed during the trial on the merits of his discriminatory failure to rehire claim. However, his request is patently improper given that I entered an order two years ago dismissing those very claims. An attempt at a new trial would have to be made via the appropriate Federal Rule of Bankruptcy Procedure. Even assuming Gill's request were not procedurally improper, Silvi's testimony does not lead me to question the facts as I have already found them.

Cawley wrote a letter of recommendation for Gill on November 5, 1992. Ex. 41.

Nine months after Gill was terminated (and a few months after Mazur suggested he send in another resume) Howard Horder, a Human Resources Administrator at Leslie Fay's New York offices, placed an advertisement seeking a Production Manager for the Spitalnik division in the January 12, 1993 edition of *Women's Wear Daily*. Cl's Ex. 35; D's Ex. K. Gill testified that he responded to the Spitalnik advertisement twice—first by mailing an application in January 1993 and then by faxing a copy of his resume in March 1993. Cl's Ex. 35, 36, 37; Gill, Tr. 493, 511 (June 9, 1997).

Although he responded to the advertisement, Gill did not communicate with Cawley, Silvi, or Mazur to let them know that he had applied for the Spitalnik position or to seek any assistance in obtaining the position. On cross-examination, Gill admitted that he could not remember when he sent the resume in response to the Spitalnik advertisement, but he was sure that he had sent two copies. Gill also candidly admitted that he was terrible with dates. He suggests that the January 12, 1993, date handwritten at the top of the photocopy of the Spitalnik ad that he retained with his records proves that he sent the resume on that date. However, Mrs. Gill contradicted him, testifying that they always received their copy of *Women's Wear Daily* the day after it was published, so that the handwritten date at the top represents the date of the ad. L. Gill, Tr. 539 (June 9, 1997). Gill's (or his wife's) notes indicate that he mailed a resume on February 14, 1993, and faxed one on March 11, 1993.

The relevance of when Gill mailed his resume lies in the fact that Horder filled the position on January 27, 1993, in all likelihood before Gill even applied for it. Moreover, Horder testified that he meticulously reviewed all responses, numbered and coded them, and put them in a single folder. He was sure that he did not receive an application from Gill in response to the Spitalnik advertisement. Horder, Tr. 154 (Feb. 18, 1997). The person Horder hired was David Gerstein (age 52), who is six years younger than Gill. Gerstein eventually was terminated when the Spitalnik division shut down operations in April 1995. Horder and most of the other employees were also terminated.

Gill testified that he should have been hired for Ochs' position but he admitted he had no experience in sourcing imports. Tr. 528. In suggesting that he should have gotten Guarilia's position, Gill admits that Guarilia is the same age as he, but testified that "ability should be valued." He also suggests that he should have been asked to fill the Director of Distribution position which was given to Granahan, although he admits that he never worked in distribution at Leslie Fay and did not know if they knew if he had experience in that area from previous employment. Gill, Tr. 439 (May 29, 1997).

Gill maintains that he should have been offered yet other positions opening up at Leslie Fay after his termination. Cl's Exs. 15, 57, 67, 44, 56, 45, 43, 47, 49, 48; Gill, Tr. 439–40, 445–46 (May 29, 1997). The positions included several available Vice President of Manufacturing positions filled by Dan Liedy (age 49) on December 20, 1993; Don Cilley (age 48) on January 10, 1994; Katherine Bini (age 49) on December 20, 1993; and Wilhelm Meyer (age 58) on March 1, 1994. (Remember that these were some of the positions which Ochs filled from among his former co-workers at Liz Claiborne.) Gill also submits that he should have been hired for a Director of Manufacturing position opening up on December 27, 1993, but filled by Amr Fahmy (age 31), a Production Supervisor position opening up on June 27, 1994 and filled by Richard Hastings (age 57), and a trim buying position filled on January 1, 1994 by Mary Louise Sierchio (age 42). Gill admits, however, that he did not apply for any of these positions which were filled by Don Och's people well after Gill was let go.

### 4. Kishbaugh

Kishbaugh was hired in November 1976 (at age 36) and terminated on November 12, 1993 (at age 53). Throughout his tenure, Kishbaugh was a Leslie Fay Factory Manager and spent time at more than one of Leslie Fay's dress factories. At the time of his termination, Kishbaugh was the Factory

Manager for Leslie Fay's Downing Garment factory in Wilkes–Barre, Pennsylvania. Kishbaugh alleges that, at the time of his termination, younger factory managers were treated more favorably. Since his termination, Kishbaugh has been either unemployed or employed only part-time.

As mentioned earlier, in August 1993 Leslie Fay informed Kishbaugh that the Pennsylvania factories would be closing and that certain of their personnel would be transferred up to Route 315; that no factory managers would be transferred; and that his factory would be the first to close. Kishbaugh, Tr. 213 (Feb. 18, 1997). Kishbaugh, although unhappy with his termination, accepted his plight.

When Kishbaugh learned that McGavin had been transferred notwithstanding the closing of his factory, Kishbaugh sent an application to Silvi "for the position of Factory Manager of Pittston/Andy Fashions." Cl's Ex. 5; Silvi, Tr. 39–41 (Feb. 18, 1997). Silvi did not respond to Kishbaugh because no factory manager jobs were available; McGavin was running the facility for which Kishbaugh had applied. Kishbaugh maintains that he nonetheless should have been offered the Factory Manager position at Pittston/Andy Fashion because he was more qualified and experienced than McGavin. Ms. Kishbaugh testified that, as time study engineer, she would review monthly reports regarding performance at the factories. She said that her husband's "erosion values" were about a third better than Marino's and Bachkosky's but, she admitted, only sometimes slightly better than McGavin's. She testified that erosion values measured the efficiency of the factory, and that in 1993 and 1994, Bachkosky (who was 42 and employed at Leslie Fay longer than any other factory manager) consistently went over costs, his erosion values were always unacceptable, and he was not complying with the specifications

issued by the engineering department.[9] Whatever the relative merits were of the six factory managers, individual performance was not terribly relevant for, as Cawley testified, all the factories were operating at a considerable loss and no one was performing markedly better than another. (It was for this very reason that Leslie Fay studied the unit production system—to see if domestic operations could be made profitable where they were uniformly unprofitable.)

Kishbaugh also maintains that he should have been given the job in the examining department that Phil Marino obtained in 1994. Kishbaugh had had experience in examining and thus could have filled Marino's position, although he admitted he did not know if he had told that to anyone at Leslie Fay. The cover letter to his resume indicated only that he was looking for the factory manager position. Cl's Ex. 5.

Although Kishbaugh signed a release in the form that some of the other plaintiffs signed and received severance benefits (which he has not returned), his release did not have appended to it a list informing him of the positions and ages of other employees terminated in connection with the reduction in force, an unambiguous requirement for a knowing and voluntary release of age discrimination claims under the Older Workers Benefit Protection Act of 1990. *See* D's Ex. A.

### 5. Terwilliger

Raymond Terwilliger was hired by Leslie Fay in February 1978 (at age 30) and was terminated by Leslie Fay's President, Alan Golub, on August 10, 1992 (at age 44). Until January 1981, he had been the Director of Personnel for Leslie Fay's Pennsylvania operations. In 1981 he was promoted to Vice President of Human Resources for all of Leslie Fay. Terwilliger received a substan-

---

**9.** According to Ms. Kishbaugh, Bachkosky's problems were not limited to his job performance, for he would also use foul language and make lewd sexual remarks to female employees. After Ricky Fashions, Bachkosky's factory, moved up to Route 315, someone must have complained to Cawley because Cawley reprimanded Bachkosky. N. Kishbaugh, Tr. 743 (June 23, 1997). Notwithstanding Cawley's rep-

rimand, Bachkosky's behavior continued. Nonetheless, however, the only female plaintiff—Michaud—did not report to Bachkosky and did not work in his factory. Nor did Michaud testify that she had ever had a run-in with Bachkosky. In any event, the record reflects that Cawley reprimanded Bachkosky and that no one else informed Cawley that Bachkosky's alleged behavior continued.

tial merit increase in 1992 and his credentials are not questioned by Leslie Fay.

Terwilliger claims that his termination was in retaliation for his speaking up about the discriminatory hiring and firing practices at Leslie Fay. However, he also testified that he told Golub at the time that Golub terminated him that he was being terminated because of his ongoing feud with Paul Polishan, Leslie Fay's Chief Financial Officer (whom Terwilliger believed was not competent). Terwilliger said that Golub announced that the termination decision was final. Vallecorse confirmed that the strain with Polishan was behind the termination. Vallecorse, Dep. Tr. 15–16 (Ex. 76) (July 5, 1995). In any event, as mentioned above, Terwilliger executed a release in return for substantial benefits for all claims resulting from alleged employment discrimination arising out of his employment and termination. Thus, only a subsequent application or right, if any, to reemployment may form the basis for recovery.

A few weeks after Terwilliger was terminated, but before he had executed a release, he called Gordon to talk about his concern that he might not find future employment before his severance ran out. Terwilliger, Tr. 226 (Nov. 27, 1995). He also may have indicated a desire to remain with Leslie Fay. *See id.* Gordon, like Golub, informed Terwilliger that he believed the decision was final. Terwilliger, Tr. 228 (Nov. 27, 1995). Terwilliger asked what would happen if he did not find another position before he exhausted his severance pay, and Gordon told him to take up the issue with Golub or John Pomerantz, Leslie Fay's Chief Executive Officer. Terwilliger then approached Golub, who assured Terwilliger that he would have "no problem" and that "Leslie Fay will stand behind you." Terwilliger says Golub mentioned that he would take money out of his own pocket if necessary. Tr. 227–28. Terwilliger testified that, as a result of these conversations, the parties put a provision into the release (which he later signed and I found valid) allowing Leslie Fay to consider paying Terwilliger additional severance "at Leslie Fay's sole option." Tr. 228, 261. Notably, nothing was put into the release agreement about

future employment, consistent with the version of this story told by Terwilliger that Gordon and Golub told him that the decision to terminate was final.

Terwilliger planned to find a new job, but the revelation of Leslie Fay's accounting irregularities made it difficult for a long-time Leslie Fay executive to find a new position. So, on April 23, 1993, Terwilliger called Gordon to ask for additional severance benefits. Terwilliger testified that Gordon apparently believed that Terwilliger had written to the media regarding Leslie Fay's accounting irregularities. Terwilliger says he denied authorship of any letter but announced that he "felt vindicated [by revelation of accounting irregularities during Polishan's tenure as Chief Financial Officer] but could not wait to be as far away from Leslie Fay for the rest of [his] life as possible." Terwilliger, Tr. 235 (Nov. 27, 1995). Gordon suggested that Terwilliger "go to hell." *Id.* Terwilliger then informed Gordon that he felt he was being backed into a corner, and Gordon repeated his instructions. Terwilliger, Tr. 102–104 (Feb. 19, 1997). Terwilliger replied that he was then forced "to do what he had to do" given his financial insecurity as a result of Leslie Fay's not keeping its agreement to consider paying him additional severance. Gordon took that as a threat, with the conversation ending on a sour note.

Subsequently, and notably after I found Terwilliger's termination claims barred by the release he signed, Terwilliger attributed a new purpose to his call to Gordon, that of reinstatement at Leslie Fay. Given Terwilliger's much earlier testimony that during this conversation he told Gordon that he could not wait to "be as far away from Leslie Fay as possible" I find it more likely that Terwilliger did not seek reinstatement as he now contends. Gordon corroborated Terwilliger's first version of the events and denied that Terwilliger "applied" for a position at Leslie Fay at this time or was looking for anything other than additional severance.

On cross-examination, Terwilliger said that he believes that Leslie Fay failed to rehire him in retaliation for a conversation that Terwilliger had had with Thrope (Leslie Fay's outside counsel) during which Terwilli-

ger told Thrope that it was management's policy to target old people for termination and sprinkle in young people. Terwilliger also said that Thrope threatened him, suggesting that if he persisted in accusing Leslie Fay of employment discrimination, Leslie Fay would make things very difficult for him. Thrope vehemently denied ever threatening Terwilliger, a long time friend. Thrope quite credibly testified that the purpose of his meeting with Terwilliger was only to suggest he get on with his life, put Leslie Fay behind him, and stop asking for additional severance. Thrope testified that discrimination was never implicitly or explicitly a part of their conversation.

It was readily apparent from Terwilliger's testimony that the April 23 conversation with Gordon did not include any implicit or explicit reference to age discrimination. Notably, it was not until *after* this conversation, in which it became clear that Leslie Fay had no present intention of paying Terwilliger additional severance, that Terwilliger filed his EEOC complaint alleging the company practiced illegal age discrimination.

Terwilliger's contention that he reapplied for a position with Leslie Fay in 1995 further illustrates his propensity to bend facts to suit his purposes. Terwilliger's purported "application" occurred when he ran into John Pomerantz while waiting for an elevator during discovery proceedings. By this time, Terwilliger had publicly accused Pomerantz of personal involvement in fraud at Leslie Fay and had suggested that Pomerantz ought be removed from management. Nonetheless, Terwilliger explains that he had (and still has) a great fondness for Pomerantz, and told him he would like to come back to Leslie Fay. He testified that he said to Pomerantz something like, "if you had only listened to me, none of this would have happened." Terwilliger testified that he then said that he would like to come back to Leslie Fay and help. Pomerantz responded with an obscenity and called Terwilliger a liar. I do not find credible Terwilliger's testimony that this encounter constituted an "application" for employment, nor is there any indication that age discrimination was a motivating factor behind Pomerantz's hostility.

As to whether other positions were available for which Terwilliger would be qualified, the answer to that question is probably yes. When Leslie Fay terminated Terwilliger, Roger Vallecorse, who is ten years older than Terwilliger and who had actually been brought in above Terwilliger in late 1991, took over his functions. When Vallecorse departed voluntarily in early 1993, he was replaced briefly by Rochelle Geller (age 41), who was promoted from her position as Director of Human Resources. In the spring of 1993, Gordon informed Michael Babcock, the then President of Leslie Fay, that he would be retiring at the end of the year. As indicated earlier in this decision, Leslie Fay decided to consolidate several functions, merging in one person the role of general counsel and director of human resources, among other things. Leslie Fay recruited Connors, a lawyer, for the top job. She in turn recruited Susanne Tully (age 46) from Liz Claiborne and gave her the title of Director of Human Resources. The two had worked together at Liz Claiborne for close to ten years. When Connors left, Tully, a non-lawyer, replaced her as Vice President of Human Resources in September 1995. Other lesser but related positions were also apparently available—in November 1992, Leslie Fay hired Howard Horder (age 32) as Human Resource Administrator. In 1993, Leslie Fay also asked Vallecorse (age 58) to return for a special assignment, interviewing employees at the Hanover facility after the discovery of the financial improprieties. Tr. 564 (June 9, 1997); 921 (June 23, 1997); Exs. 1, 76 pp. 82–84. Terwilliger was qualified for at least some of these positions becoming available after his termination.

Since his termination from Leslie Fay, Terwilliger held various part-time jobs until he formed his own consulting business, which has done fairly well.

### 6. Michaud

Elizabeth Michaud was employed by Leslie Fay at the Laflin facility as an Examining Supervisor. Her employment ceased as of December 31, 1992, when she retired. Michaud was first hired by Leslie Fay in 1947. During the next three decades, she voluntari-

ly departed from and returned to the company a number of times in different positions. On February 17, 1979, she was rehired (at age 48) as Examining Supervisor, a position she held until she retired at age 61. During the course of her employment, Michaud talked from time to time about her desire to retire.

Michaud suffers from diabetes and hypertension but there is no dispute that she was qualified for and able to perform her position. She had also received commendations from her supervisors. Michaud was herself a supervisor, responsible for the examiners who inspected finished garments in the distribution center in order to catch quality problems that were not detected at the manufacturing stage by quality control employees. Michaud, Tr. 823 (June 23, 1997); Weinstein, Tr. 306–08 (May 29, 1997). During her tenure she devised a tagging system which expedited the quality control-repair function through the use of identifiable color-coded stickers to show quickly and easily where repairs needed to be made. Ex. 71.

Michaud's disability required her to eat lunch every day on time, have access to fresh air, not carry heavy materials, and sit periodically. Leslie Fay accommodated her disability by providing her with an air-conditioned office; she also had access to a service porter to move garments around. Part of the examining function was standing and moving garments from rack to rack. Leslie Fay told her to sit and let the examiners bring questions to her. Her supervisor told her to ask the porter to carry the garments.

Throughout most of the period that Michaud was employed as Examining Supervisor, she reported to plaintiff Lewkowiez. Her relationship with Lewkowiez was a warm one. He testified that he never knew of her disability, that she often carried garments, without complaint, and that she allowed his frequent interruptions of her lunch hour, without objection.

As mentioned earlier, in August 1992, during the transition to the new audit system, Leslie Fay eliminated Lewkowiez's position. Weinstein, Tr. 278 (May 29, 1997); Granahan, Tr. 194 (May 28, 1997). Michaud was very uncooperative in implementing the new audit system. Granahan, Tr. 194 (May 28, 1997). Granahan testified that he had to speak with her two or three times about her recalcitrance in following the new procedure. He said that he recalled working with her in the past, before he was her supervisor, and that there was no compromise with Michaud. Things were done her way or no way—"you did whatever Betty wanted; that is the way things got done." Granahan testified that Michaud was combative in many situations.

Joseph Guarilia (age 57), a pressing supervisor who had been hired in April 1991, also had an aggressive personality, leading the two of them to frequent clashes. Weinstein, Tr. 292 (May 29, 1997); Michaud Tr. 834 (June 23, 1997). Guarilia moved quickly from being a presser to the supervisor of pressing. Granahan, Tr. 189 (May 28, 1997); Lewkowiez, Tr. 65 (May 28, 1997). Michaud perceived that Guarilia undermined her by shipping garments without having them repaired as per Michaud's instruction. She complained to Lewkowiez that Guarilia was removing the stickers off garments and then shipping them even though she deemed them not shippable, which was contrary to Lewkowiez's orders and company policy. Lewkowiez, Tr. 65–66 (May 28, 1997). Lewkowiez reprimanded Guarilia, who continued to ship what Michaud had determined were inferior garments. Lewkowiez complained to Galen Erickson, the shipping director, but was told that the goods had to go because they had been prebilled. Lewkowiez, Tr. 66, 69–70 (May 28, 1997).

Lewkowiez never complained to Cawley, his supervisor, about Guarilia's alleged shipment of inferior garments, but in any event, Cawley said he was not surprised to learn of it. He said that sometimes it was a business decision whether to ship the customer or repair the goods, and it was always a management decision. Cawley, Tr. 145. When Weinstein was asked whether Guarilia would have been promoted had Weinstein known that Guarilia was shipping "inferior garments," Weinstein testified that he would have looked into the situation, but corroborated Cawley's testimony characterizing quality control as "art not science;" there were always differences of opinion as to what

is passing and what is not. Weinstein, Tr. 311 (May 29, 1997). Weinstein, who was in the Laflin distribution center every Friday, testified that Lewkowiez had not complained to him of Guarilia's alleged shipping of inferior garments. *Id.* at 311–12.

In late 1991 and 1992, Michaud testified, she started to feel very sick and depressed. She reports that after Guarilia came on board her blood sugar level increased and her blood pressure skyrocketed, although she offers no medical proof of her assertions.[10] As mentioned, during the onset of the new audit system, in August 1992, Lewkowiez's position was eliminated. At the time, Michaud asked Lewkowiez if she could be transferred out of the department, but he told her it was out of his hands.

After Lewkowiez's departure, Leslie Fay promoted Guarilia to the position of Manager of the Exam and Repair Department, a position directly above Michaud. Gurailia now reported to the production person, Granahan, who in turn reported to Cawley. Guarilia had only been with Leslie Fay just over a year. Michaud, although considered for the promotion, was passed over. Michaud testified that she should have been given the promotion because she had been with Leslie Fay longer and had better qualifications. She says she even had to teach Guarilia various portions of the examining function because his prior management experience had been in managing the manufacture of shoes, not dresses. Weinstein testified that it was Erickson who had been Guarilia's manager and who decided to promote Guarilia; Weinstein had confidence in Erickson's decision. Michaud contends that she did not get the manager position because she was a woman. She offers the testimony of Nina Kishbaugh who heard Mr. Lynne Williams,

Leslie Fay's Chief Engineer, say that "as long as present management was in control of Leslie Fay, there would never be another woman manager." N. Kishbaugh, Tr. 754–57 (June 23, 1997). Ms. Kishbaugh testified that qualified women were given the title of "Sewing Section Supervisor" while men in the same position were titled, "Plant Manager Trainee," although their functions were the same. Ms. Kishbaugh recounted that Leslie Fay had a woman supervisor named Ann Krupa, a graduate of the Fashion Institute of Technology, who had had more training than any male plant manager but was never given the opportunity to be manager. *Id.*

In response, Leslie Fay offers the names of several women in positions of authority, some of whom were hired after Michaud filed her proof of claim against the estate. *See* D's Ex. D (Joan Ruby, Vice President/General Counsel); Cl.'s Ex 15 (Kathryn Connors, Human Resources, hired Aug. 1, 1993; Susanne Tully, Human Resources, hired Feb. 16, 1994); Cl.'s Ex. 50 (Tina Adams, Director of Manufacturing, hired Sept. 1991); Ex. 51 (Michele Israel, Vice President, hired Mar. 1994); and Ex. 52 (Annette Mathieu, Vice President, hired Apr. 1994).

Granahan and Weinstein both testified that Guarilia, rather than Michaud, was promoted because he had had substantial experience as a factory operations manager, albeit in a shoe factory. Granahan, Tr. 187, 189 (May 28, 1997); Weinstein, Tr. 291 (May 29, 1997). Granahan admitted that while Michaud had the technical skills needed for her own position, those skills were less important for the operations management position into which Guarilia was promoted. Granahan explained that Guarilia's qualifications for manager "far

---

10. Michaud called Dr. Stanley Portnow, a psychiatrist, to testify as to her disability. Dr. Portnow first examined Michaud a few days before the trial, and had never met her before. Portnow did not compare Michaud's medical reports before Guarilia became her supervisor with reports on her medical condition after he became her supervisor, although Michaud had seen doctors during both periods. Portnow confined his testimony to what she had told him about her condition and what she had told him about how she was feeling. He did not offer a medical opinion on what Guarilia's hostility, if true, could

have done to a person with diabetes and hypertension. He also offered no link between her depression and Guarilia's treatment. For all those reasons I do not believe Dr. Portnow's testimony carries any great weight. Michaud herself testified as to her condition, that is, that both her blood pressure and blood sugar level increased and that Guarilia's treatment depressed her. Because the evidence is in the record through Michaud, there is no need for me to rely on Dr. Portnow's report of the same information.

exceeded" Michaud's—he had the people skills, negotiating experience, ability to take orders, and ability to delegate responsibility that are necessary as a manager; and he had been an operations manager for over thirty years. Granahan, Tr. 189 (May 28, 1997); *see also* Weinstein, Tr. 291 (May 29, 1997). Guarilia knew how to negotiate and accomplish what had to be done, said Granahan, and he told Michaud that Guarilia was promoted because Guarilia possessed the proper managerial skills. Michaud testified that after Guarilia became her supervisor he wanted fewer correction stickers on the garments: "Joe did not want us to spend a lot of time to examine them, but the factories wanted more information on the garments that were going back." She felt slighted that the system which she designed was not being employed as she intended. Indeed Michaud informed Cawley, the Vice President of Manufacturing who was responsible for the Laflin distribution center, that Guarilia "was cheating the paying customers" by shipping inferior garments. After Cawley reported this call to Granahan, in what Michaud remembered as a three hour meeting both Guarilia and Granahan reprimanded her for going outside her "line of authority" to Cawley to complain that bad quality garments were being pushed through without examination. She testified that both Granahan and Guarilia forbid her from "telling anybody about anything," instructing her that in the future, she was to bring her problems to Guarilia and then if still unresolved to Granahan. Tr. 853–54.

As the 1992 RIFS were underway, Michaud asked Guarilia if she could be included in the layoffs. Guarilia transmitted her request to his supervisors, Granahan and Erickson, who rejected it because Michaud's position was not being eliminated. For a reason that was not apparent to me, Michaud was upset with Guarilia for telling Granahan of her request.

In the fall of 1992, Michaud testified, Guarilia often screamed at her. She described Guarilia standing with his hands on his hips, gritting his teeth, watching her. If he saw her limp or wince, she says he would say, "If you're too damn sick, why don't you get the hell out[?]" Michaud testified that Guarilia

stated several times over a period of a few months that she should leave if she was "so damn sick." Michaud, Tr. 844–45.

Michaud also testified that after Guarilia became her supervisor, she was not allowed to use her air-conditioned office except during lunch or a break. She testified that Guarilia forced her to write her reports standing up outside her office and that although Guarilia told her to ask the porter to carry garments for her, when the porter was not around, Guarilia laughed when he saw her struggling with garments. Michaud also said that Guarilia threatened to take the porter away, an assertion which does not square with her testimony that Guarilia told her to use the porter to transport dresses. Granahan testified that Michaud never complained to him about having to stand or carry garments and that she never complained that Guarilia was threatening her or not accommodating her disability. Lewkowiez also testified that Michaud never complained about standing or carrying garments.

In support of her constructive discharge theory, Michaud complains that from "time to time" Guarilia and Granahan would interrupt her lunch hour for conferences. Michaud, Tr. 849 (June 23, 1997). In such instances, she testified, she would tell them that she needed a full lunch hour but they would talk to her about work anyway. Granahan admitted that he would sometimes talk with Michaud during her lunch hour, and that she would say she needed to eat. He says he responded that she should continue to eat; he never prevented her from eating, a point which Michaud never contradicted. Lewkowiez testified that he had never had any problem working with Michaud. Although she objected to Granahan's and Guarilia's interruptions of her lunch hour she equably tolerated Lewkowiez's frequent lunch hour interruptions and conferences. Lewkowiez, Tr. 86, 87 (May 28, 1997). Obviously, she was far more tolerant of those she liked than of those she didn't.

In one instance, Michaud testified, the women in the examining room were complaining to her that there was not enough space for them to work because there were too many dresses. Michaud baited Guarilia;

rather than discussing the matter with him in private, in front of the women she asked Guarilia to find a way of getting more air in the work area for the examiners. Guarilia told her to "shut up," and go to her office. (Although he was her supervisor, in view of her disability, Michaud had the only available office, which was air conditioned; Guarilia stayed out on the floor.) At that point Guarilia slammed his hand on the desk, saying, "Do I have to beat you to understand that its [sic] what I say and not what you say?" Michaud, Tr. 844 (June 23, 1997).

Michaud testified that Guarilia would malign her in front of the examiners. He was not happy with the way the examiners worked, the way Michaud would teach them, the amount of product they were getting out. She resented that Guarilia "pitted the girls" against her, which she felt was not right given that she had worked with many of the women for many years.

At some point Michaud called Granahan down to her office "to tell him about this whole thing, about how Joe slammed the desk and he upset [her] so badly many times." Granahan said he would get back to her, but never did. Michaud testified that she thinks she called Cawley twice, one time, as earlier mentioned, to tell him about Guarilia's pulling the stickers off the dresses, and another time to tell him that she "really couldn't stand to work for Joe anymore, it was ruining [her] health." Michaud, Tr. 853 (June 23, 1997). But Cawley testified that it never came to his attention from Michaud or otherwise that Guarilia was abusing Michaud. Granahan also testified that Michaud never told him that Guarilia was threatening her, yelling at her, or refusing to accommodate her medical needs. Michaud, Tr. 853; Granahan, Tr. 192–93 (May 28, 1997); Cawley, Tr. 139 (May 28, 1997). It is not clear what Michaud complained to Granahan about other than Guarilia slamming the desk. As for her complaints to Cawley, there is no inconsistency between her testimony and Cawley's because there is no indication that she complained about anything other than business disagreements, not mentioning harassment or Guarilia's perceived refusal to accommodate her disability.

In the fall of 1992, Michaud received no raise. Granahan testified that she did not receive a raise because she was uncooperative in implementing the new audit system. He said he told her that she needed to improve her people skills, work better with other managers in other departments, and had to get the new audit system off the ground and rolling. Granahan, Tr. 205–06 (May 28, 1997). (Guarilia, despite his higher position, was paid less per week than Michaud, and, in fact, during Michaud's tenure, never earned as much as she.) Granahan, Tr. 192–93, 204–05 (May 28, 1997); D's Ex. O.

Granahan testified that one of the reasons why Michaud did not get the raise was her combativeness in too many situations, including the implementation of the new audit procedures. Michaud's own testimony demonstrates that many of the disagreements she had had with her supervisors related to performance issues and her perceived insubordination. For example, Michaud testified that in 1989 or 1990 she had had a harsh exchange with Paul Polishan, Leslie Fay's former Chief Financial Offer, because he directed her to include items in inventory that she did not think worthy of sale. Polishan ordered her to tell her staff to count the items and prepare them for sale. Michaud protested, explaining that she did not think anyone should have to work on such dirty items. Michaud had proven herself sufficiently tough that Polishan resorted to rather unbecoming behavior, insisting "You'll do it or I'll make your life hell." Michaud, Tr. 838 (June 23, 1997).

Michaud was both strong-willed and petty, at least as far as Guarilia was concerned; this was illustrated and when the parking spaces were changed. Although her new space was closer to the door than her old one, she says she was upset because she had to walk over two car-lengths of gravel. (There is nothing in the record to suggest that she had any difficulty walking, particularly in physically undemanding conditions.) She complained to both Guarilia and Granahan. Her discomfiture was caused less by the gravel than by the fact that Guarilia's space was a "better" one than hers. Al-

though her supervisors explained to her that the spaces had been randomly assigned, she was not mollified, apparently still perceiving her allotted space as a slight. Michaud, Tr. 882 (June 23, 1997).

Michaud testified that after she was denied a raise, in October 1992, she asked Cawley for a transfer, but he said he knew of nothing that was available. In December she also asked Silvi, who agreed that there was nothing available. Around that time, however, she discovered that she was eligible for early survivor social security benefits so she informed Erickson that she was going to retire. At no time did Michaud tell any Leslie Fay manager that she wanted to retire because Guarilia was abusing her or refusing to accommodate her health problems. Michaud, Tr. 202–03 (June 23, 1997). Indeed, she participated in the planning of her retirement party and selected the memento she was to receive. Id. 204.

Since her retirement, Michaud has worked at a number of part-time jobs but has avoided positions that would increase her income level such that her survivor benefits would be reduced. Id. 862–64, 868–69. Michaud does not allege that she applied for future positions or that she was promised she would be considered for any future position.

## II.

### A. *Jurisdiction*

The claimants have repeatedly asserted that I lack jurisdiction to adjudicate their claims. Over the last two years they have also made several motions to withdraw the reference, all of which have been denied by the district court. I have previously ruled on the jurisdictional issue, finding I had core jurisdiction to adjudicate the claims because the plaintiffs filed proofs of claim against the estate. *See In re Leslie Fay Cos., Inc.*, 181 B.R. 156, 160 (Bankr.S.D.N.Y.1995) (citing *e.g.*, 28 U.S.C. § 157(b)(2)(B); *Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59 n. 14, 109 S.Ct. 2782, 2799 n. 14, 106 L.Ed.2d 26 (1989); *Katchen v. Landy*, 382 U.S. 323, 337, 86 S.Ct. 467, 476–77, 15 L.Ed.2d 391 (1966); *S.G.*

*Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702 (2d Cir.1995)) (determinative factor as to the bankruptcy court's core jurisdiction to adjudicate city's claim was that the city filed a proof of claim).

The only ground upon which the claimants rely in contending that I lack jurisdiction is that because they have a right to a jury trial in the absence of bankruptcy, the proceeding must be conducted in the district court. They confine their argument to the following:

> The Debtors' Objections to Claimants' Proofs of Claims will require factual determinations by the Court with respect to the merits of such claims. Such factual and credibility determinations are the function of a jury. This is especially so in discrimination cases in which significant reliance upon circumstantial evidence is necessary as has been extensively noted by the Courts.

Joint Estimation Hearing Pre–Trial Order, Relief Prayed, ¶ A at 2–3 (May 19, 1997); Joint Pre–Trial Order, Issues of Law, ¶ A. at 36–37 (both briefs citing *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994)).

■ No one questions that an employee has an initial right to a jury trial for an employment discrimination claim. However, notwithstanding 28 U.S.C. § 626(c)(2), such a right is subject to waiver by the employee. *See Washington v. New York City Bd. of Estimate*, 709 F.2d 792 (2d Cir.1983) (employee's failure to file request for jury trial within deadline waived employee's right to jury trial), *cert. denied*, 464 U.S. 1013, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983). In the bankruptcy arena it has been held that an employee with a discrimination claim, just like many of the other claimants with jury trial rights, may waive that right by filing a proof of claim and thereby consenting to the claim's inclusion in the equitable reordering of a debtor's assets in the bankruptcy court. *See Wittes v. Interco Inc.*, 137 B.R. 328 (E.D.Mo.1992) (Age Discrimination in Employment Act claims properly decided in bankruptcy court); *In re Interco Inc.*, 152 B.R. 273 (Bankr.E.D.Mo.1993) (same).

■ Although the claimants do not argue that their claims constitute personal injury torts within the meaning of section 157(b)(2)(B), the issue is subject to some debate in the courts.[11] I need not add my voice to the controversy, however, because the claimants have waived the issue. *See Adams v. Cumberland Farms, Inc.*, 86 F.3d 1146 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 387, 136 L.Ed.2d 303 (1996). Subject matter jurisdiction is not lacking given that section 157(b)(2)(B) is not jurisdictional; it defines only what is core and not core. "The classification of a proceeding as core or non-core does not determine the jurisdiction of a bankruptcy court, but instead relates to a determination of whether the court may enter a final order or judgment or whether it may only issue findings of fact and conclusions of law upon which the district court enters a final order upon *de novo* review." *In re Wefco*, 97 B.R. 749, 751 (E.D.N.Y.1989). Bankruptcy courts retain jurisdiction over non-core matters, and further, parties may waive their right to *de novo* review by failing to assert that an action involving them is non-core. *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1137–38 (2d Cir.1987) (citing 28 U.S.C. 157(c)(1), (c)(2)); *Gravel & Shea v. Vermont Nat'l Bank*, 162

B.R. 961, 966 (D.Vt.1993). This holds true for a claimant's contention that his claims constitute personal injuries within the meaning of section 157(b)(2)(B). *See Adams*, 86 F.3d 1146. Section 157(b)(5) does not change the result, for the provision only directs the procedure once it is determined that an action is a personal injury tort. *In re Manning*, 71 B.R. 981 (Bankr.N.D.Ala.1987); *see also Coker v. Pan American World Airways*, 950 F.2d 839, 841–45 (2d Cir.1991) (notwithstanding section 157(b)(5), which directs that claim "shall be tried in the district court," district court has power of permissive abstention to allow the claims to be tried in state court).

I find persuasive the First Circuit's unpublished decision in *Adams* finding a waiver of the issue whether the injury alleged constituted a personal injury tort where the claimant did not raise the matter before the bankruptcy court. Here, in all the time the claimants insisted their claims be tried in the district court, they *never* argued that I lacked core jurisdiction over their claims because they were "personal injury torts," nor did the claimants argue that 28 U.S.C. § 157(b)(2)(B) or (b)(5) precluded my presiding over this trial. (There is also no indication that the claimants made any of these assertions before the district court.) Accordingly, I turn to the merits.

**11.** *See Priest v. Interco, Inc. (In re Interco)*, 135 B.R. 359, 361–62 (Bankr.E.D.Mo.1991) (holding that personal injury exception should be construed narrowly so as not to include torts without physical injury); *accord Perino v. Cohen (In re Cohen)*, 107 B.R. 453 (S.D.N.Y.1989) (personal injury within the meaning of 28 U.S.C. § 157 requires impairment beyond "mere shame and humiliation"); *In re Atron Inc.*, 172 B.R. 541, 544–45 (Bankr.W.D.Mich.1994) ("While not minimizing the emotional pain characteristic of job loss, the Claimant in the present case simply does not allege that his emotional suffering reached the level of a personal injury tort.... We are unwilling to adopt the broad exception to bankruptcy court jurisdiction urged by Claimant and thus open the door to a mass exodus of the claims allowance process to the district court ...."); *see also Siewert v. Christy (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 194 B.R. 728, 734 (S.D.N.Y.1995) (emotional damages, while not inconsequential, are not sufficient to transfer a business tort into a personal injury tort). *cf. Bertholet v. Harman*, 126 B.R. 413, 416 (Bankr.D.N.H.1991) (in *debtor's* adversary proceeding against bankruptcy

trustee for damage to debtor's principal, court held that plaintiff's contemplated expert testimony regarding plaintiff's fatigue and anxiety/stress was not the gravamen of the complaint and therefore not subject to 28 U.S.C. § 157(a)(5)).

*But cf. Thomas v. Adams (In re Gary Brew Enters. Ltd.)*, 198 B.R. 616 (Bankr.S.D.Cal.1996) (Peterson, C.J.) (concluding that racial discrimination claim was in the nature of a "personal injury tort" necessitating trial in the district court); *see also Williamson v. Patterson (In re Patterson)*, 150 B.R. 367, 368 (E.D.Va.1993); *cf. Boyer v. Balanoff (In re Boyer)*, 93 B.R. 313 (Bankr.N.D.N.Y.1988) (Gerling, J.) (in *debtor's* adversary proceeding against third parties, bankruptcy court had no jurisdiction because the debtor's discrimination claims were properly characterized as "personal injury tort" claims within the meaning of 28 U.S.C. § 157(b)(5)); *Smith v. New York State Higher Education Servs. Corp. (In re Smith)*, 95 B.R. 286, 290, 291 (Bankr.N.D.N.Y.1988) (same); *see also Hansen v. Borough of Seaside Park (In re Hansen)*, 164 B.R. 482, 483–84, 485–86 (D.N.J.1994) (no "subject matter" jurisdiction).

774

## B. *Release and Waiver Under the ADEA*

The first substantive issue arises under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, as amended by Title II of the Older Workers Benefit Protection Act of 1990 ("OWBPA"), 29 U.S.C. § 626(b), concerning the effect of the release, drafted by Leslie Fay and signed by Kishbaugh, by which Kishbaugh purports to waive all claims, including those based on age discrimination, associated with his termination and employment at Leslie Fay. Kishbaugh contends that he did not release his ADEA claims because the release fails to meet specific and detailed requirements of OWBPA. Leslie Fay admits that the release did not comport with the requirements for a knowing and voluntary release mandated by the OWBPA, but argues that it nonetheless must be enforced because Kishbaugh did not "tender back" the severance benefits received under it.

Under the OWBPA, "an individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1) (1990). "[A] waiver may not be knowing and voluntary unless at a minimum" it meets certain specific requirements laid out by the statute, only one of which is relevant here—if the employee is terminated as part of an employment termination program, the employee must receive in writing "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program." 29 U.S.C. § 626(f)(1)(H). Leslie Fay does not dispute that Kishbaugh's termination fell under "an employment termination program" within the meaning of the statute and that the company failed to comply with subsection (H).

Leslie Fay argues that notwithstanding the mandatory requirements of the OWBPA, an employee may ratify an invalid release by failing to promptly repudiate it upon learning that it was unlawfully obtained. *See Di Rose v. PK Management Corp.*, 691 F.2d 628, 633 (2d Cir.1982) (under the common law a "contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so."), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983). The burden of proving ratification of an invalid release rests upon Leslie Fay. Leslie Fay also argues that Kishbaugh must be deemed to have ratified the release because he did not tender back the $10,200 he received as a result of signing it.

Whether the OWBPA was intended to supplant the common law doctrine of ratification is the subject of intense debate. *See Reid v. IBM Corp.*, No. 95 Civ. 1755, 1997 WL 357969, *14 (S.D.N.Y. June 26, 1997) (quoting 29 U.S.C. § 626(f)(1)); *compare Blistein v. St. John's College*, 74 F.3d 1459, 1466 (4th Cir.1996) (holding ADEA release enforceable notwithstanding employer's failure to conform the release to the OWBPA because "upon learning that the agreement is voidable, the employee, like the party who acted under duress, can either avoid performance of the contract or accept its benefits and thereby ratify the contract"); *Fleming v. U.S. Postal Serv.*, 27 F.3d 259, 261–62 (7th Cir.1994); *Wittorf v. Shell Oil Co.*, 37 F.3d 1151, 1154 (5th Cir.1994) (same); *Wamsley v. Champlin Refining & Chemicals, Inc.*, 11 F.3d 534, 539–40 (5th Cir.1993) (same), *cert. denied*, 514 U.S. 1037, 115 S.Ct. 1403, 131 L.Ed.2d 290 (1995); *with Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1534 (3d Cir.1997) ("In light of the law as it now stands, we conclude that the ratification doctrine does not apply to ADEA releases which fail to comply with the OWBPA."); *Raczak v. Ameritech Corp.*, 1994 WL 780899 (E.D.Mich. 1994), *rev'd in part*, 103 F.3d 1257, 1270 (6th Cir.1997) ("Rather than a bar to suit, a release should be considered as a factor that would reduce the judgment amount received by a plaintiff upon bringing suit"); *Oberg v. Allied Van Lines, Inc.*, 11 F.3d 679 (7th Cir.1993); *Forbus v. Sears, Roebuck & Co.*, 958 F.2d 1036 (11th Cir.1992); *Eye v. Fluor Corp.*, 952 F.Supp. 635, 641 (E.D.Mo.1997); *Soliman v. Digital Equipment Corp.*, 869 F.Supp. 65 (D.Mass.1994); *Isaacs v. Caterpillar, Inc.*, 765 F.Supp. 1359 (C.D.Ill.1991).

Assuming ratification is possible, whether the common law requires "tendering back" the proceeds of a voidable release before maintaining an action is also the subject of debate. *See, e.g., Reid v. IBM Corp.,* No. 95 Civ. 1755, 1997 WL 357969, *14 (S.D.N.Y. June 26, 1997); *Hodge v. New York College of Podiatric Medicine,* 940 F.Supp. 579, 579 (S.D.N.Y.1996); *cf. Kristoferson v. Otis Spunkmeyer, Inc.,* No. 96 Civ. 2521, 1997 WL 297027 (S.D.N.Y. June 4, 1997). Recently the United States Supreme Court granted certiorari on a case implicating these issues. *See Oubre v. Entergy Operations, Inc.,* 1996 WL 902063, 1996 U.S. Dist. LEXIS 748, *aff'd,* 112 F.3d 787 (5th Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 1466, 137 L.Ed.2d 680 (1997).

The only precedent in this district is *Hodge v. New York College of Podiatric Medicine,* 940 F.Supp. 579, 584 (S.D.N.Y. 1996) in which Judge Jones held that "[a]n agreement that fails to meet the requirements of the OWBPA is merely voidable and not void, and thus can be ratified by acceptance of the benefits conferred by the agreement." The facts in *Hodge,* however, are very different. After the plaintiff filed an EEOC charge, the employer offered the plaintiff an employment contract in exchange for the plaintiff's withdrawal of the EEOC complaint and waiver of those claims. The waiver, however, did not comport with the mandatory requirements of the OWBPA. When the employment agreement expired, the plaintiff sued on his old claims. The court deemed the originally invalid release ratified by the employee's acceptance of the employment contract and the employee's and the employer's completed performance thereunder. It was clear that in *Hodge* the only consideration the plaintiff provided for the release was the release of his age discrimination claims; no other claims were released. Further there was no way to make the employer whole if the release were held invalid because the employment contract that the employer gave in exchange for the release was fully completed by the time the plaintiff initiated the action. *Hodge,* however, did not hold that a plaintiff desiring to sue on ADEA claims when the purported release failed to comport with the mandatory requirements of the OWBPA must "tender back" the monetary consideration received in exchange.

■ Kishbaugh executed his release on November 15, 1993. He learned in February or March 1994 that Leslie Fay was indeed transferring managers, contrary to what he was told when he executed the release. He re-applied for a position on March 24, 1994, notifying the company that it had come to his attention that Leslie Fay was transferring managers. When the company did not respond within a reasonable time, Kishbaugh filed an EEOC charge. On August 3, 1994, he filed a proof of claim with this court. Under these circumstances, Leslie Fay has not persuaded me that Kishbaugh did not act promptly in repudiating the release of his ADEA claims. *See Di Rose,* 691 F.2d at 633.

■ We turn to whether the common law doctrine of "tender back" applies to bar Kishbaugh from now claiming he is not bound by the release. Significantly, Kishbaugh did not release only his ADEA claims. As noted by almost every court considering whether ratification is possible, the OWBPA and the ADEA do not declare a non-conforming release "void." Therefore, a proper inquiry may be to look at the value of the consideration received and whether other claims were also released. *See generally Long,* 105 F.3d at 1548 (3d Cir.1997) (dissent). For example, if the plaintiff released other claims lawfully (i.e. breach of contract, slip and fall claims) it would appear inequitable to require the plaintiff to return the totality of the benefits paid before being able to maintain an age discrimination suit for those claims which were unlawfully released. In some instances the adjudication of that value may await trial. *See generally Long,* 105 F.3d at 1543 (majority opinion) ("An employer found liable will be entitled to a set-off of any severance benefits paid").

Whereas it is generally inequitable to allow a plaintiff to retain the proceeds of an invalid release and at the same time maintain a lawsuit on the very claims that the release was intended to obviate, that principle may not have the same vitality under the OWBPA even in the face of the common law doctrines of voidability, ratification, and tender back.

The reason is that, under the common law, the release is either going to be found valid or not depending on whether it was procured by fraud or duress, whereas in an OWBPA suit, the whole release is not necessarily invalid. Notably, the statute declares the release of age discrimination claims unknowing and not voluntary only when certain statutory minima are not met. Additionally, the policy behind the ADEA and the OWBPA suggests that a *per se* rule requiring tender back would be inappropriate. In enacting the ADEA, Congress determined that "older workers find themselves disadvantaged in their efforts to retain employment and especially to regain employment when displaced from their jobs." 29 U.S.C. § 621. *Kristofferson* noted that retired employees in age discrimination lawsuits might never be able to earn the wherewithal to return the consideration, 1997 WL 297027 at * 4, a result that would appear clearly at odds with the purpose of the ADEA and OWBPA; *see Long,* 105 F.3d at 1539–1542 (analogizing OWBPA to the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 (1939) under which the Supreme Court held that the tender back doctrine was "wholly incongruous with the [statute's] general policy." *Hogue v. Southern R. Co.,* 390 U.S. 516, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968)).

Kishbaugh received $10,200 when he was terminated in 1992 at age 53 after having been with Leslie Fay since 1976. Aside from his ADEA claims, Kishbaugh released "any and all charges, claims and actions arising out of his employment" that arose prior to his termination. The release of these claims would not be valid unless the party who gave the release received something of value to which that party was not otherwise entitled. *Chaput v. Unisys Corp.,* 964 F.2d 1299, 1301 (2d Cir.) (applying New York law). Because Kishbaugh gave up something more than his ADEA claims, I do not believe that his failure to tender back the severance paid is fatal to his action, although, were he to recover, a setoff might be appropriate.

## C. *Age Discrimination*

The ADEA was enacted in 1967 to combat age discrimination in employment settings. 29 U.S.C. § 621–634 (1988). The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (1988). The New York Human Rights Law affords protections similar to the ADEA, see N.Y. Exec. Law § 296(1)(a) (McKinney's 1997), as does the Pennsylvania Human Rights Law embodied in section 955(a) of the Pennsylvania Human Relations law. All of New York's and Pennsylvania's employment discrimination laws and the ADEA follow the analysis and shifting burdens of proof outlined by courts interpreting civil rights violations under title VII. *See Armbruster v. Erie Civic Center Auth.,* 937 F.Supp. 484, 495 (W.D.Pa.1995) (interpreting 43 Pa. Stat. Ann. § 951 *et seq.), aff'd,* 100 F.3d 946 (3d Cir. 1996); *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1225 (2d Cir.1994) (interpreting ADEA and N.Y. Exec. Law 296(1)(a)).

First, the plaintiff must present a *prima facie* case of discrimination by showing that:

(1) he is a member of a protected class;

(2) he is qualified for the position;

(3) he was discharged;

(4) in circumstances giving rise to an inference of age discrimination.

*See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To rebut a plaintiff's *prima facie* case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–25, 113 S.Ct. 2742, 2746–57, 125 L.Ed.2d 407 (1993); *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) ("the defendant need not persuade the court that it was actually motivated by the proffered reasons in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof"); *Board of Trustees v. Sweeney,* 439 U.S. 24,

25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978) (employer need only "explain ... what he has done"); *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980) (defendants "do not have the burden of establishing that their basis was sound"); *Viola v. Philips Medical Sys. of North America,* 42 F.3d 712, 716, 718 (2d Cir.1994); *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.,* 964 F.2d 106, 111 (2d Cir.1992).

After the defendant meets its burden of production, the plaintiff at all times retains the burden of proving that it is more likely than not his age was a motivating factor in the challenged employment action. *Burger v. New York Institute of Technology,* 94 F.3d 830, 832–33 (2d Cir.1996) (plaintiff carries burden of persuasion); *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Ostrowski v. Atlantic Mutual Ins. Cos.,* 968 F.2d 171, 181–82 (2d Cir.1992); *see also Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203–04 (2d Cir.1995) (RIF case); *Montana v. First Fed. Savings & Loan Ass'n,* 869 F.2d 100, 105 (2d Cir. 1989) (plaintiff need only prove that "her age did make a difference."); *Sutera v. Schering Corp.,* 73 F.3d 13, 16 (2d Cir.1995) (If the defendant carries its burden of production, the plaintiff must show by the preponderance of the evidence that the defendant's articulated reason is more likely than not a pretext for age discrimination).

### 1. *Gill*

■ Gill, who signed a valid and binding release for his termination claims, alleges that Leslie Fay failed to rehire him because of his age. A discriminatory "failure to rehire" case, like a discriminatory termination case, is established under the *McDonnell Douglas* test. However, the "mere continuing failure to rehire, without further action on [the] plaintiff's part by way of reapplication or renewed application" cannot revive a plaintiff's original termination claims. *Abrahamsen v. Sperry Rand Corp.,* 20 Fair Emp. Prac. Dec (CCH) ¶ 30,068, 1979 WL 241, *3

(E.D.N.Y. June 8, 1979), *aff'd,* 614 F.2d 1285 (2d Cir.1979); *Burnam v. Amoco Container Co.,* 755 F.2d 893, 894 (11th Cir.1985); *Farnum v. Swiss Bank Corp.,* 39 Fair Emp. Prac. Cas. (BNA) 1865, 1986 WL 1172, *2 (S.D.N.Y. Jan. 23, 1986). A plaintiff may, however, show that the employer has a policy of rehiring younger but not older employees. *See, e.g., Equal Employment Opportunity Comm'n v. Farmer Bros. Co.,* 31 F.3d 891, 899–900 (9th Cir.1994).

■ Gill alleges that at the time he was terminated from his production manager position Mazur assured him that if any position became available, he would be considered. Gill contends that he applied for an open position in the Spitalnik division for which he was qualified and was rejected because of his age, with Leslie Fay hiring someone for the position who was five years his junior. Gill arguably has presented facts sufficient to state a *prima facie* case for age discrimination in Leslie Fay's failure to rehire him.[12]

Howard Horder, who had placed the ad for the position, never received Gill's application. Gill argues that Leslie Fay had an obligation to consider him for all future positions in light of Mazur's stated intention to find Gill another job at Leslie Fay. However, Gill testified that in a subsequent conversation Mazur told him that, "I'm sorry but they want you out." This being so, Gill could not reasonably have relied on any statement of future intention which Mazur may earlier have made. And if Gill was relying on Mazur, why didn't Gill call Mazur about the position advertised in the newspaper? Based on this evidence, I do not think that it was reasonable for Gill to presume that, without the need to make applications, he would be considered for all future positions opening at Leslie Fay. Gill seems to have recognized this himself, since he says he actually applied for the Spitalnik position.

■ As for the second position, which was not advertised but was filled by Ochs (age

---

**12.** Once the employer comes forward on its burden of production, "whether the plaintiff had properly made out a *prima facie* case ... is no longer relevant." *United States Postal Serv. v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Thus, if the defendant

has met its burden of production, the court need not determine whether the plaintiff has established a *prima facie* case, but rather must proceed to determine the ultimate question of whether the defendant intentionally discriminated against the plaintiff. *Id.*

52), the fact that Leslie Fay did not recruit Gill for the position does not raise the spectre of age discrimination. Ochs specialized in import sourcing, an area admittedly outside of Gill's expertise. Leslie Fay's filling the other positions with people from Liz Claiborne (ages 57, 49, 48, 48, 41, 37 and 31) does not demonstrate that Gill was not recruited for these jobs because of his age. It is quite apparent that Ochs hired these people from Liz Claiborne because he had worked with them previously and their focus was on import sourcing.

■ Gill's assertion that he should have received Guarilia's job is interesting. Whereas the two are the same age, Gill testified that he should have been offered the position because "qualifications should be considered." I agree, but the failure to consider Gill for Guarilia's job is not attributable to actionable age discrimination. *O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) ("an inference of age discrimination can not be drawn from the replacement of one worker with another worker insignificantly younger"); *see also Viola,* 42 F.3d at 718 ("Job qualification is a necessary predicate to establishing a *prima facie* case but it is not sufficient to create an inference of discriminatory intent.").

In short, I do not believe that age discrimination played a part in Leslie Fay's failure to rehire Gill.

### 2. Falbaum

■ Promissory estoppel probably prevents Leslie Fay from contending that it did not have to consider Falbaum for the top distribution position when it opened up eleven months after his termination. Falbaum was never told why Erickson had been brought in above him, and Weinstein assured Falbaum after he was terminated that Weinstein would continue to look for a position for Falbaum. Falbaum testified that he did not send in further applications because he relied on Weinstein's promise to consider him. This caused Falbaum not to apply for Erickson's position when he left. That reliance is reasonable insofar as the opening was (i) of the position which Falbaum had held prior to

Erickson's employment and (ii) occurred not too long after Falbaum was laid off. The fact that Falbaum did not apply for Erickson's position thus does not insulate Leslie Fay from Falbaum's claim for failure to rehire. Leslie Fay had reason to foresee Falbaum's reliance because Weinstein assured Falbaum he would be considered at the time they were urging he sign their release and accept benefits which Falbaum had indicated he believed inadequate. *See generally Chemical Bank v. City of Jamestown,* 122 A.D.2d 530, 531, 504 N.Y.S.2d 908, 909–10 (4th Dep't 1986) (in enforcing promissory estoppel, the plaintiff must allege and prove (1) clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained in reliance); *see also Kastel v. Winnetka Board of Ed.,* 946 F.Supp. 1329, 1340–42 (N.D.Ill.1996) (applying promissory estoppel to failure to rehire claim).

■ Bob Sink (age 49), an existing Leslie Fay employee who is six years younger than Falbaum, was transferred into the position that became available when Erickson left. Whereas Leslie Fay makes much of the fact that Sink himself is in the protected class, this fact alone does not rebut discriminatory intent: "The fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant, so long as he has lost out because of his age." *O'Connor,* —— U.S. at ——, 116 S.Ct. at 1310. Although Leslie Fay's witnesses neglected to explain why they did not consider Falbaum for Erickson's position, the undated critical memorandum from Mazur is strongly suggestive that Falbaum was not considered for his old position for performance reasons unrelated to age discrimination. Notably, Erickson had been brought in above Falbaum more than a year before Falbaum was terminated. Terwilliger's testimony that when Erickson was hired Terwilliger was told that "it was another situation where someone was going to get hurt by New York" does not suggest that Falbaum was either replaced because he was an older employee or not rehired for that same reason. In addition, Sink's transfer is consistent with Leslie Fay's policy of transferring

rather than laying off employees with a broad understanding of the industry. While Sink was a few years younger than Falbaum, the ADEA " 'mandates that an employer reach employment decisions without regard to age, but it does not place an affirmative duty upon an employer to accord special treatment to members of the protected group.' " *Rosengarten v. J.C. Penney Co.,* 605 F.Supp. 154, 157 (E.D.N.Y.1985) (quoting *Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982)); *Parcinski v. Outlet Co.,* 673 F.2d 34, 37 (2d Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 725, 74 L.Ed.2d 950 (1983). I think it more likely than not that Leslie Fay's failure to rehire Falbaum for the position that Leslie Fay created above Falbaum a year before he was terminated was for reasons unrelated to age discrimination.

Falbaum also contends that he should have received a position at Sassco for which he says he applied. But Leslie Fay hired someone the same age as Falbaum, so Falbaum's age could not have been a motivating factor in Leslie Fay's decision not to hire him. *O'Connor,* —— U.S. at ——, 116 S.Ct. at 1310. Moreover, Leslie Fay has demonstrated that Falbaum never applied for the 1993 Sassco position. There can be no viable claim to promissory estoppel insofar as Sassco is concerned because Falbaum knew that Sassco operated separately. In any event, I also found credible Schreiber's testimony that even if Falbaum had applied (which he did not), Sassco was not interested in hiring him for reasons completely unrelated to his age.

Another position that Falbaum contends he was entitled to was earned by Granahan when Sink left in October 1995, more than three years after Falbaum was terminated. Even assuming (without deciding) that Falbaum was justified in continuing to rely on Weinstein's 1992 assurance without the need to notify Leslie Fay that he was still looking for employment more than three years later (a presumption I doubt), I do not think that Leslie Fay's decision to promote Granahan, who was already performing an existing function, was motivated by age discrimina-

tion. It was consistent with the corporate policy. Falbaum's own testimony demonstrates that at the time Falbaum left, Granahan (whom Falbaum himself had recruited to Leslie Fay) was a qualified person with considerable potential as a manager.

### 3. Terwilliger

■ Unlike the other claimants, Terwilliger bases his surviving claim for failure to rehire upon retaliation as well as age discrimination. So we pause to look at the law regarding retaliatory discrimination.

The New York Human Rights Law provides that it shall be unlawful for any employer to discriminate against any person because he or she has opposed any practices forbidden under that law. N.Y. Exec. Law § 296(1)(e). Retaliation claims require the same shifting burden of proof analysis as for age discrimination claims and the ultimate burden of persuasion rests, as always, on the plaintiff. *Padilla v. Metro–North Commuter R.R.,* 92 F.3d 117, 122 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997).

To establish a prima *facie case* of retaliation, a plaintiff must demonstrate that:

(1) the employee was engaged in protected activity;

(2) the employer was aware of that activity;

(3) the employee suffered an adverse employment action; and

(4) there was a causal connection between the protected activity and the adverse employment action.

*Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988); *Reed v. A.W. Lawrence & Co. Inc.,* 95 F.3d 1170, 1177–78 (2d Cir.1996). For retaliation claims, "an employee need not establish that the conduct she [or he] opposed was in fact a violation of Title VII [or the ADEA], but rather, only that she [or he] had a good faith, reasonable belief that the underlying employment practice was unlawful." *Reed,* 95 F.3d at 1178–80 (quoting *Manoharan,* 842 F.2d at 593).

Terwilliger's accounts of personal objection to age discrimination practices and resultant

retaliation for those objections are vague and inconsistent. Almost as an afterthought, Terwilliger argues that age discrimination and Leslie Fay's intent to practice it were the driving forces in its decision not to rehire him in April 1993. However, Terwilliger's own account contains no reference to age discrimination. Rather, the company was angered by his veiled threat that he was "going to do what [he] had to do." Terwilliger, Tr. 104 (Feb. 19, 1997). It is telling that Terwilliger's EEOC complaint alleging age discrimination was not filed until after his conversation with Gordon in which additional severance was denied.

Terwilliger's deduction that he was discharged for having told Thrope that Leslie Fay had a policy of terminating older people and "sprinkling in" younger people is likely inaccurate. It is undisputed that Leslie Fay terminated just about two-thirds of its work force; it is nonsensical that the many younger members of that force were simply terminated to cover up Leslie Fay's intent to rid itself of older workers. Leslie Fay perceived a real economic need to consolidate its facilities, a decision which I am not in a position to second guess. *See Parcinski*, 673 F.2d at 37. During the time that Leslie Fay was consolidating its facilities, it actually hired older personnel, some of whom remain with the company today.[13] The claimants have not offered statistical evidence regarding the percentage of employees remaining with the company today broken down by the relevant protected characteristic as compared with prior to the closing of domestic manufacture, such that I may draw the claimants' suggested inference. In short, there is nothing credible in this record to give substance to the claimants' assertion that age-based animus drove Leslie Fay's decision to stop manufacturing in the United States. *See Wilson v. Supreme Color Card, Inc.*, 703 F.Supp. 289, 298–99 (S.D.N.Y.) ("no reasonable and fair-minded jury could find that [the company] laid off five minority men, fabricated a lost lease, and moved its plant and lost business,

as a pretext to discriminate against [the plaintiff]"), *aff'd*, 880 F.2d 1320 (2d Cir.1989). The record demonstrates that Leslie Fay undertook extensive analysis regarding this matter to see if domestic operations could be made profitable. Nor does Terwilliger's testimony that Alan Golub told Terwilliger that Weinstein was hired—"to change the direction of the Pennsylvania factories ... [and that] Weinstein would do whatever he had to do"—demonstrate age discrimination. Even if Golub had made those comments, they are entirely age neutral. Indeed, they comport with what occurred, significant reorganization to lower overhead.

I also do not see anything insidious about the adding of younger names to the August 1992 RIF list. Terwilliger admitted that there were young names on the original list and Weinstein, Silvi, and Vallecorse testified that they only added names to ensure that the layoffs were in compliance with the anti-employment discrimination laws. Standing alone, this fact does not lead me to conclude that by so doing, Leslie Fay must have harbored a desire to terminate older workers. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir.1990); *Pisana v. Merrill Lynch & Co.*, No. 93 Civ. 4541, 1995 WL 438715, *7 (S.D.N.Y. July 24, 1995); *Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1261 (D.N.J.1994), *aff'd*, 67 F.3d 291 (3d Cir.1995). Terwilliger argues that names of younger people were added in order to disguise and conceal the true motive of management to eliminate older employees, but he offers nothing in support of this contention. Whereas Terwilliger said that there were lists put together by Polishan and others referred to as "hit lists" and that Lewkowiez was on one of those lists, this pejorative nomenclature proves nothing; that there were lists of people to be terminated is not at all surprising during an RIF.

Terwilliger has not proven that he even applied for a position with Leslie Fay after his termination. His suggestion that an ap-

---

13. The continued employment of Ms. Bini, however, does not in itself rebut discriminatory intent. This is so because Leslie Fay was already aware of the pending discrimination case and EEOC complaints against it when it hired and

decided to retain Ms. Bini. *See Burger v. Litton Indus., Inc.*, 91 Civ. 0918, 1996 WL 421449, at *12, 1996 U.S. Dist. Lexis 5560, at *37 (S.D.N.Y. Apr. 24, 1996) (citations omitted).

plication was unnecessary because Leslie Fay would always rehire those it previously terminated without the need for further application is incredible. Leslie Fay was engaged in massive layoffs to reduce costs. It defies logic to suggest that a company undergoing massive restructuring generally would obligate itself to rehire the very employees it had just laid off. According to Terwilliger's first version of the story, both Golub and Gordon informed him that the decision to terminate him was final and Terwilliger responded that he could not wait to be as far away from Leslie Fay as possible. It was not until after I found his release valid that he concocted the story of promises of future employment. Terwilliger did not apply for reemployment during his conversation with Gordon, nor did he apply during his conversation with Pomerantz at the elevator bank in 1995. Terwilliger's description of his 1995 conversation with Pomerantz suggests an "I told you so" tone, rather than one seeking reemployment. Plainly, the relationship between the two had deteriorated to such a degree that Pomerantz would not have felt comfortable working alongside Terwilliger. Terwilliger had made public his view that Pomerantz ought be removed from management and was personally involved in a fraud on the company; that being so, I also have my doubts about whether Terwilliger would have applied for further employment while Pomerantz remained at the helm.

Whereas Leslie Fay did hire others for lesser or comparable positions for which Terwilliger was probably qualified, Terwilliger did not demonstrate that Leslie Fay's failure to hire him was the result of age discrimination or retaliation for his objection to age discrimination. Instead the testimony showed that (i) others were hired in some instances because of senior management's proclivity to recruit from Liz Claiborne and (ii) Terwilliger was not rehired due to management's disquietude about his repeated demands for additional severance and what was perceived as his implicit threat about what would occur if he were not given what he asked for. Remember that Terwilliger waived his claims for retaliatory termination and may not resurrect them now by simply suggesting that he applied for new employ-

ment. There must be a new and separate act of discrimination or retaliation for his objection to age discrimination to stand. *Burnam v. Amoco Container Co.,* 755 F.2d 893, 894 (11th Cir.1985); *see Tschida v. Ramsey County,* 927 F.Supp. 337, 340–43 (D.Minn.1996), *aff'd,* 108 F.3d 1382 (8th Cir. 1997); *Redd v. Fisher Controls,* 814 F.Supp. 547, 550 (W.D.Tex.1992) (citing *Delaware State College v. Ricks,* 449 U.S. 250, 261, 101 S.Ct. 498, 505–06, 66 L.Ed.2d 431 (1980)), *aff'd* 35 F.3d 561 (5th Cir.1994).

■ Terwilliger's retaliation claim is presented in a wholly conclusory fashion, without facts or theories that would suggest a causal connection between Leslie Fay's failure to rehire him and age discrimination or prohibited retaliatory animus. Whether Leslie Fay's reasons for not hiring him were commendable or not is irrelevant so long as age discrimination was not a factor in Leslie Fay's adverse employment decision. "The defendant's reason need not be one that the court would agree with, but it must not be discriminatory." *Pisana,* 1995 WL 438715, at *2 (citing *Wilson v. Supreme Color Card, Inc.,* 703 F.Supp. 289, 300 (S.D.N.Y.), *aff'd without opinion,* 880 F.2d 1320 (2d Cir.1989); *see also Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985); *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir. 1984)) ("The defendant is not obligated to show justifiable cause" for the adverse employment decision); *Stanojev v. Ebasco Servs., Inc.,* 643 F.2d 914, 921–22 (2d Cir. 1981); *Octtaviani v. Long Island College Hospital,* No. 87 Civ. 1772, 1991 WL 42922 (E.D.N.Y. Mar. 14, 1991) (no civil rights violation when plaintiff was terminated for refusing to assist supervisor in ousting coworker even though supervisor called plaintiff a racially based slur shortly before he was terminated); *Rosengarten,* 605 F.Supp. at 157–58 (quoting *Miller v. General Elec. Co.,* 562 F.Supp. 610, 617 (E.D.Pa.1983)); *see also Dennis v. Veritas Therapeutic Community, Inc.,* No. 83 Civ. 8698, 1985 WL 425 (S.D.N.Y. Mar. 20, 1985).

It just does not make sense that age had anything to do with Terwilliger's plight. He undeniably had a poor relationship with Polishan. He made statements about Pomer-

antz which soured their relationship. Although he now claims that Leslie Fay had been discriminating for years, he did not blow the whistle despite his position as the Vice President of Human Resources. Even when he himself was terminated he did not raise the spectre of age discrimination until Leslie Fay decided not to give him more severance benefits than they had originally agreed to. Accordingly, I reject his theory that he was not rehired because of age discrimination or prohibited retaliation.

### 4. *Lewkowiez*

■ Lewkowiez claims wrongful discharge stemming from a reduction in force and discriminatory failure to rehire. Lewkowiez was terminated at age 56 although he was performing according to his employer's legitimate expectations. *See Vanderstappen v. Brock Equip. Co.*, No. 87 Civ. 20200, 1988 WL 131539, *2 (N.D.Ill.1988). Despite the elimination of Lewkowiez's position, other, younger people continued to perform a quality control function which actually continues at Leslie Fay today, albeit with respect to imports. Lewkowiez contends that the people who had reported to him began reporting to a much younger production person who was in his thirties. About a year and a half after Lewkowiez was terminated, Leslie Fay also hired a younger employee and named him Director of Quality Control, the same or approximately the same job title which Lewkowiez had held while he was there. The younger employee was given a position for which Lewkowiez was more than qualified. These facts are sufficient to state a *prima facie* case of age discrimination. *See Fisher v. Vassar College*, 114 F.3d 1332, 1333 (2d Cir.1997).

■ Leslie Fay explained that Lewkowiez's position was eliminated and never recreated despite the retention of the title. Lewkowiez's focus had been as an overseer of many different functions which ensured the quality of dresses from their inception, rather than simply ensuring that the finished products were deemed worthy of shipment to customers. Cawley testified that Lewkowiez's roles were absorbed by many different people; those who directly reported to Lewkowiez would now report to the production

head of each division. Leslie Fay also demonstrated that Farrell, the person to whom Leslie Fay gave Lewkowiez's old title, focused on the *examining* aspects of quality control, a position very different from the one which Lewkowiez held. With this, Leslie Fay has met its burden of production.

■ "[T]he similarity of the jobs held by an older and younger employee is the touchstone for determining whether a lay-off of the older may be found to be an ADEA violation by a trier of fact." *Burger*, 94 F.3d at 833 (citing *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 111–12 (2d Cir.1992)). Relevant comparisons include considering the status of non-protected employees with similar, although not identical, job functions and titles. *Id.* Weinstein testified in great detail as to why Lewkowiez's position was eliminated—Lewkowiez's oversight functions were redundant with those of others already involved in the manufacturing process. Leslie Fay proved that it has not hired another person for the position that Lewkowiez filled. Because Leslie Fay was winding down its domestic manufacturing, there was no longer a need for Lewkowiez's expertise in overseeing the quality control of the domestic manufacture of dresses. Lewkowiez has not rebutted this testimony nor has he demonstrated that his age was a motivating factor in Leslie Fay's decision to eliminate his position. There is little suggestion of age discrimination to be drawn in a reduction in force case where the employee's duties are eliminated and the employee cannot demonstrate the employer's continuing need for his skills. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421–22 (9th Cir.1990). Although Lewkowiez testified that had he been offered a lower level position with Leslie Fay he might have taken it, he doesn't say whether or not he expressed that desire to Leslie Fay. (Moreover, the statement is suspect in light of Lewkowiez's declining a higher-paying position with Liz Claiborne.)

Although Weinstein wrote Lewkowiez a letter suggesting that he would be considered for future employment, Lewkowiez does not demonstrate that he relied on that assertion. *See generally Chemical Bank*, 122 A.D.2d at 531, 504 N.Y.S.2d at 909. Instead, Lewkow-

iez promptly asked for a recommendation letter and found a comparable position in Florida. The simple fact that Weinstein assured Lewkowiez that they would continue to look for a position for him does not prove that Leslie Fay's failure to rehire Lewkowiez for the position filled by Farrell in April 1994 (and later Marino) was the result of age discrimination. The record reflects that the two positions were very different and that Lewkowiez was already gainfully employed in Florida, having also just turned down a position at Liz Claiborne which offered him considerably more money than what he was earning in Florida, not to mention more than what he had earned at Leslie Fay. Moreover, Farrell was hired as part of Ochs' recruiting efforts and Leslie Fay's belief that Farrell could assist in expanding Leslie Fay's customer base, both legitimate nondiscriminatory reasons to hire Farrell and not Lewkowiez. Virtually all of the people who testified attested that it was general business practice to recruit away from other more successful companies. Whereas Terwilliger testified that "it had everything to do with age" he does not explain why this was so. Ochs himself was 52 when hired, and five of the seven people he recruited were in the protected age group.

■ Lewkowiez also asserts age discrimination lurked behind Leslie Fay's failure to hire him for the Indonesian position which he had asked for within six months of his termination. Cawley testified that he did not remember Lewkowiez asking for that position, but if he did, Cawley says, he would have directed Lewkowiez to the head of *foreign* manufacturing because Cawley had no authority to hire for overseas. Lewkowiez, on the other hand, specifically recalls Cawley telling him that he was needed in domestic manufacturing as the reason why Lewkowiez could not have the job. Although Cawley admitted to a failed memory in this regard, at best, Lewkowiez has demonstrated that Leslie Fay's proffered reason for not hiring him for the Indonesian position is untrue. However, while "[i]n some cases, an employer's proffered reason is a mask for unlawful discrimination, ... discrimination does not lurk behind every inaccurate statement." *Fisher,* 114 F.3d at 1337. Given the ease at

which the plaintiff may meet his burden of showing a *prima facie* case, "the evidence required to establish a *prima facie* case under *McDonnell Douglas* is not invariably sufficient to sustain an ultimate finding of illegal discrimination." *Id.* Thus, if the plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reasons, then the employer's decision remains unexplained and the plaintiff "may rely on the evidence constituting the *prima facie* case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action." *Fisher,* 114 F.3d at 1333; *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1038–39 (2d Cir.1993).

Here, the record is clear that young Cawley got the job in Indonesia because of his relationship to a long-standing Leslie Fay employee. Although the hiring of a less qualified employee because of nepotism may be a questionable business practice, it is not actionable under the ADEA. *See Fisher,* 114 F.3d at 1337; *Dennis,* 1985 WL 425.

### 5. *Kishbaugh*

Kishbaugh claims wrongful discharge stemming from a reduction in force. At the time Kishbaugh's factory closed and he was terminated, Kishbaugh was 53 years old and performing according to his employer's legitimate expectations. Leslie Fay told him that no factory managers would be transferred when their factories closed. Notwithstanding that representation, Leslie Fay did transfer a younger factory manager around the time that Kishbaugh was terminated.

■ The primary focus is whether Leslie Fay treated Kishbaugh less favorably because of his age. The scrutiny is not limited as Leslie Fay suggests to whether Kishbaugh was *replaced* by a younger employee or whether the younger employee had been brought in *after* Kishbaugh was terminated. *See Montana v. First Fed. Savings & Loan Ass'n,* 869 F.2d 100, 104–105 (2d Cir.1989). An inference of age discrimination can be established by evidence showing that younger employees were retained in positions similar to Kishbaugh's. *See Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.,* 964

F.2d 106 (2d Cir.1992); *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994); *Vanderstappen v. Brock Equipment Co.*, No. 87 Civ. 20200, 1988 WL 131539, *2 (N.D.Ill. Nov. 22, 1988).

■ "An employer's failure to transfer or rehire older employees, while according such treatment to younger ones, is enough to establish plaintiffs *prima facie* case." *Palmer v. Readers Digest Ass'n, Inc.*, 84 Civ. 8397, 1992 WL 73468, *16 (S.D.N.Y. Apr. 1, 1992); *see also Poklitar v. CBS, Inc.*, 652 F.Supp. 1023, 1027–28 (S.D.N.Y.1987).[14] Kishbaugh has met this burden, as the chart below illustrates:

| Factory Manager | Factory | Date Factory moved to Route 315 | Date Manager Terminated | Order Terminated | Age of Manager in Nov. 1993 | Length of Service at Leslie Fay |
| --- | --- | --- | --- | --- | --- | --- |
| Plaintiff Kishbaugli | Downing | 11/93 | Nov.1993 | 1 | 53 | 16 years |
| Tommy Gill | Andy | 12/93 | Dec.1993 | 2 | 50+ | — |
| Pitcavage | Kingston | 12/94 | Dec.1994 | 3 | 50 | 8 years |
| Backikosky | Ricky | 11/92 | Aug.1995 | 4 | 41 | 18 years |
| McGavin | Pittston | 2/94 | Aug.1995 | 4 | 40 | 12 years |
| Marino | Throop | 6/94 | still employed | — | 84 | 7 years |

■ In order to rebut the presumption of age discrimination, Leslie Fay has the burden of proffering "a legitimate non-discriminatory business rationale for its actions." *Viola*, 42 F.3d at 716.

The purpose of the *McDonnell Douglas* framework is to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent. *Fisher*, 114 F.3d at 1335 (citing *Burdine*, 450 U.S. at 254–56 & n. 8, 101 S.Ct. at 1094–95 & n. 8). The Supreme Court in *Burdine* explained the reason for placing a burden of production on the defendant at this stage.

Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to establish pretext.

*Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1095. Cawley explained that Kishbaugh was terminated as a result of a legitimate reduction in force and that he rather than Bachko-sky was terminated because Bachkosky was already in place when Kishbaugh's factory merged into Ricky Fashions, which was the largest factory. With this, Leslie Fay has satisfied its burden of production. *See St. Mary's Honor Center*, 509 U.S. 502, 508–11, 514–17, 113 S.Ct. 2742, 2747–49, 2751–53, 125 L.Ed.2d 407 (1993). The burden of proving age discrimination remains upon Kishbaugh.

In showing discrimination, the plaintiff may show direct evidence, statistical evidence or circumstantial evidence of age discrimination. *Montana*, 869 F.2d at 104. "In cases involving a reduction in force, the inquiry is highly fact specific." *Burger v. New York Institute of Technology*, 94 F.3d 830 (2d Cir. 1996). "[C]ircumstantial evidence must lead a reasonable fact finder to conclude either [that] (1)[the] defendant consciously refused to consider retaining or relocating plaintiff because of his age, or (2)[the] defendant regarded age as a negative factor in such consideration." *Franci v. Avco Corp.*, 538 F.Supp. 250, 256 (D.Conn.1982) (citing *Williams v. General Motors*, 656 F.2d 120, 129–30 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982)). As noted by the Second Circuit, discrimina-

---

14. A reduction in force alone does not shift the burden back to the plaintiff or remove the defendant's actions from the reach of the ADEA; the defendant may, however, simply point to the age-neutral procedure that it has implemented in order to meet its burden of production—the only burden it carries. *Viola*, 42 F.3d at 716; *Gallo*, 22 F.3d at 1224–25; *see also Vanderstappen*, 1988 WL 131539 at * 1–2; *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 81 (2d Cir.1983); *Williams v. General Motors Corp.*, 656 F.2d 120, 128 (5th Cir.1981); *Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339 (D.C.Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983).

tion cases are often dependent upon circumstantial evidence.

> In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the court must be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors forbidden by law.... Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.

*Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (internal citations and quotation omitted).

In a disparate treatment case, statistical evidence showing a disparate impact may be circumstantial evidence of an intent to discriminate. *Massarsky,* 706 F.2d at 118 & n. 14. "A finder of fact is permitted to draw an inference of age discrimination from evidence that, in implementing a reduction in force, the employer has located new positions for younger, but not older, employees." *Cronin,* 46 F.3d at 204.

Kishbaugh has demonstrated that for the six manufacturing facilities moved into Route 315, the only factory manager retained is the youngest one and the next two youngest were among the last to go. Kishbaugh was told that no factory managers would be transferred but thereafter the two youngest ones were transferred. The statistical evidence thus shows some disparity. A sufficient disparity may constitute a "pattern or practice" of discrimination and may support a finding of intentional discrimination. *See Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 598–99 (2d Cir.1986) (citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (proof of pattern or practice of discrimination supports inference that "any particular employment decision during the period in which the discriminatory policy was in force, was made in pursuit of that plan")); *Ellis v. Provident Life & Accident Ins. Co.,* No. 91 Civ. 7074, 1995 WL 453333, *

5 (S.D.N.Y. Aug. 1, 1995) (citing *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir. 1984); *Stanojev v. Ebasco Servs., Inc.,* 643 F.2d 914, 921 (2d Cir.1981)), *aff'd,* 107 F.3d 2, 1997 WL 76861 (2d Cir. Feb. 24, 1997); *see also Scelsa v. City Univ. of N.Y.,* 806 F.Supp. 1126, 1143 (S.D.N.Y.1992) ("While in a disparate treatment case, proof of discriminatory intent is required, in some cases it can be inferred from the 'mere fact of a difference in treatment.'"); *Segar v. Smith,* 738 F.2d 1249, 1271–72 (D.C.Cir.1984), *cert. denied sub. nom. Meese v. Segar,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *Silver v. City Univ. of N.Y.,* 767 F.Supp. 494, 498 (S.D.N.Y.), *aff'd,* 947 F.2d 1021 (2d Cir.1991).

To succeed on a pattern or practice theory, the plaintiff must demonstrate more than "isolated" or "sporadic discriminatory acts." *Ste Marie v. Eastern R. Ass'n,* 650 F.2d 395, 405 (2d Cir.1981). They must show that the discrimination was "the regular rather than the unusual practice of the defendant." *Id.* at 405–06. In rebutting the inferences arising from the disparity, the defendant may show that the plaintiff's statistics are misleading or may present legitimate nondiscriminatory reasons for the apparent disparity. *Kilgo v. Bowman Transportation, Inc.,* 789 F.2d 859, 874 (11th Cir.1986).

Leslie Fay has rebutted the statistics by offering credible explanations as to why it terminated Kishbaugh and kept Bachkosky and as to why it retained Marino. Bachkosky's Ricky Fashions' plant moved up to Route 315 in 1992, *before* Leslie Fay decided in August 1993 to close all of the manufacturing facilities. Thus it certainly would make sense that when Downing merged with Ricky, Kishbaugh was the manager to be terminated. Bachkosky was already running the facility and had also been with the company longer than Kishbaugh. Leslie Fay has also offered a convincing rationale for its retention of young Mr. Marino despite the closing of his factory and notwithstanding the fact that Leslie Fay had earlier told Kishbaugh that no factory managers would be transferred. Marino was transferred in the spring of 1994, coinciding with the strike at Throop and the need for people at Laflin. He had acquired a new expertise during the

strike which greatly increased his usefulness to Leslie Fay.

Leslie Fay has failed, however, to explain why it kept McGavin and terminated the older Tommy Gill. This does leave room for a permissible inference that Leslie Fay's explanation as to why it terminated Kishbaugh and not Bachkosky may not be the true one. This is so because Gill's and McGavin's factories were the same size and in Gill's case (unlike with Kishbaugh) his factory actually moved up to Route 315 before McGavin's.

> A defendant which is less than honest in proffering its reasons for discharge risks an unnecessary age discrimination verdict. . . . [T]he *McDonnell Douglas* test is based on the Supreme Court's assumption that 'when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, [a fact finder may (but not necessarily must) conclude] it is more likely than not the employer . . . based his decision on an impermissible condition such as age'.

*See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (3d Cir.1987), *cert. denied*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978)); *see also Miles v. M.N.C. Corp.*, 750 F.2d 867, 871–73 (11th Cir.1985); *St. Mary's Honor Center*, 509 U.S. 502, 113 S.Ct. 2742; *Fisher*, 114 F.3d at 1338.

The answer, however, lies in Nina Kishbaugh's testimony. As she explained, after Andy was moved up to Route 315, Bachkosky was spread too thin to manage all the combined functions. Thus it would make sense that when the next factory closed, Leslie Fay would need to transfer that manager in order to assume some of the responsibilities that Bachkosky could not handle.

Kishbaugh, in his post-trial brief, argues that Leslie Fay easily could have "staggered" the closing of the plants in order to manipulate the order of termination so as to discriminate against the older factory managers. He points out that Leslie Fay knew full well it was closing all the plants in August 1993, three months before it closed Kishbaugh's factory, which was followed in short order by the closing of Andy and Pittston. Of the three factories closed within three months of each other, the only manager retained was the youngest one, McGavin (age 40). The two managers who were terminated were both over 50. McGavin had had nine to ten years' less experience than Kishbaugh and had been with the company for less time.

Leslie Fay, unaware of Kishbaugh's unasserted theory that they staggered the plant closings [15], chose not to explain why it closed the factories in the order that it did even in the face of Cawley's testimony that the factories were all performing "in the red" and that no one factory was performing better than another. Leslie Fay relies on the argument that "it is impossible to believe" that Leslie Fay would close down an entire factory at a particular time and terminate its entire staff simply to eliminate the older factory manager and retain the younger, particularly when the company is struggling to achieve profitability (and planning, in any event, to consolidate all the domestic factories). Repl. Brief at 11–12.[16] At least one

---

15. The argument was raised for the first time in the Claimants' post trial brief.

16. I should note that Leslie Fay does not have a burden of *production* on this issue because Kishbaugh has not pleaded a disparate impact claim. One of the *prima facie* elements of a disparate impact claim is to identify the challenged procedure which the plaintiff contends is causing the disparate impact. *District Council 37 v. New York City Dept. of Parks & Recreation*, 113 F.3d 347 (2d Cir.1997); *Lowe v. Commack Union Free School District*, 886 F.2d 1364, 1370 (2d Cir. 1989) (focus is not on the individual plaintiff as much as on the adverse effect of the challenged practice on the protected group of which the plaintiff is a member, citing *Wards Cove Packing Co. Inc. v. Atonio*, 490 U.S. 642, 656–60, 109 S.Ct. 2115, 2124–27, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990)); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 120 (3d Cir.1983). The requirement of naming the challenged procedure serves to put the defendant on notice as to the challenged business practice. Nowhere in any of the pretrial pleadings or proceedings, or for that matter during the trial, did the Claimants contend that Leslie Fay "staggered" the factory closings in order to have a younger bottom line. Had Kishbaugh put the defendant on notice that it was his contention that Leslie Fay's practice of closing the factories in the order in which it did

case suggests considering the sufficiency of the statistical evidence in light of any testimony in the record regarding the plaintiff's individual experience of discriminatory treatment. *Rossini*, 597 F.Supp. at 1159. As previously mentioned, I found credible Leslie Fay's explanation for terminating Kishbaugh and retaining Bachkosky and do not believe Kishbaugh was disfavored because of his age. Leslie Fay has also persuaded me that Marino was retained because of the strike at Laflin. I find it hard to accept Kishbaugh's assertion that Leslie Fay probably staggered the plant closings in order to have enabled it to retain McGavin and Marino. There were many ramifications of closing factories, most notably the termination of many supervisory personnel in addition to each plant's manager. It seems more likely that Leslie Fay decided to merge all the factories with a single manager supervising the surviving factory and that Leslie Fay did not abandon this strategy until it saw that Bachkosky could not handle everything placed on his shoulders. In light of Leslie Fay's discovery that its original plan would not work it probably changed gears, transferring a second manager, McGavin, to Route 315. I also do not think it more probable than not that Leslie Fay foresaw the spring 1994 union strike as early as August 1993, as Kishbaugh's theory would require me to believe, to find that Leslie Fay did not close that factory until the strike so that Marino could then be transferred to Laflin to acquire needed expertise.

██ While there is no hard and fast rule on how many discriminatory firings are required to make a pattern or practice inten-

tional discrimination case, Leslie Fay has persuaded me that of the three suspicious terminations, two were justified by business considerations, leaving only one unexplained. That one unexplained termination is insufficient for me to conclude that Leslie Fay engaged in a pattern or practice of age discrimination such that Kishbaugh prevails. *See Marie v. Eastern R.R. Ass'n*, 650 F.2d 395, 406 (2d Cir.1981); *see also Rossini*, 597 F.Supp. at 1159 ("Though the employer is not required to meet a burden of persuasion of rebutting the disparate treatment claim, the nondiscriminatory explanation must cast sufficient doubt on the plaintiff's proof to permit the trier of fact legitimately to decline to draw an inference of discrimination from that proof."). Although this is a close case in light of Leslie Fay's failure to explain its decision-making process for McGavin, Kishbaugh retains the burden of demonstrating discriminatory intent by a preponderance of the evidence. I am not persuaded that more likely than not Leslie Fay's decision to terminate him was motivated by age discrimination. The numbers are admittedly curious, but there does not appear to be a concerted effort to get rid of older workers.

██ Kishbaugh also asserts a claim for discriminatory failure to rehire. At the time Kishbaugh was terminated, he was not assured that the company would continue to look for a position for him. Kishbaugh submitted a resume a few months later asking for the factory manager position of Pittston/Andy Fashions. That position was not available, however, Leslie Fay having already filled it with the Pittston Manager a month before Leslie Fay received Kishbaugh's ap-

---

had a discriminatory impact on his protected class, a verdict in Kishbaugh's favor might have been rendered in that Leslie Fay failed to offer a legitimate business justification for closing the factories in the order that it did. *See Fisher, supra*, (if the defendant fails to come forward and proffer a non-discriminatory explanation "in such a circumstance the jury must rule for the plaintiff unless the employer submits evidence that places in doubt the facts underlying plaintiff's *prima facie* case (such as plaintiff's qualification for the job), or furnishes a satisfactory explanation for its inability to tell the reason why the plaintiff was disfavored."); *see also Segar*, 738 F.2d at 1271 (under disparate impact theory, "the employer will be required to show the job

relatedness of only the practice or practices identified as the cause of the disparity"). Here, however, Kishbaugh unveiled this new theory of the case in his post trial brief, effectively eliminating Leslie Fay's ability to meet a burden of production on a disparate impact case. Therefore Kishbaugh cannot rely on a disparate impact theory of recovery. *Rossini*, 798 F.2d at 605; *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 24–25 (2d Cir.1988) (The critical question "is whether the defendant was reasonably aware of the claim, not whether the plaintiff at some point in the pretrial period happened to use the right phrase."), *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989); *Armbruster v. Unisys Corp.*, No Civ. 91–5948, 1996 WL 55659 (E.D.Pa. Feb. 7, 1996).

plication. Kishbaugh has not raised facts sufficient to prove his assertion that Leslie Fay retained McGavin and did not rehire Kishbaugh because of age discrimination.

## D. *Sex and Disability Discrimination*

### 1. *Michaud's Claim of Sex Discrimination*

 To establish a *prima facie* case of sex discrimination under Title VII, the plaintiff is required to show that she was treated less favorably than comparably based male employees in circumstances from which a gender-based motive could be inferred. *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 106 (2d Cir.1989); *Burger v. Litton Computer Servs.,* 91 Civ. 0918, 1996 WL 421449, at *12, 1996 U.S. Dist. Lexis 5560, *27–28 (S.D.N.Y. Apr. 24, 1996) (citing *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994)).

Michaud has stated a *prima facie* case for discriminatory failure to promote. She is in the protected class, sought the position for which she was qualified and was rejected. Leslie Fay placed a man in the position notwithstanding Michaud's greater service to the company. *See Burger,* 1996 WL 421449, at * 11, 1996 U.S. Dist. LEXIS 5560 at *7–8.

Leslie Fay explains that Guarilia was more qualified for the factory manager position, having been a factory manager for many years. Granahan testified that Michaud was having trouble accepting the new audit procedures and was very combative in business situations. With this, Leslie Fay has met its burden of proffering a legitimate business justification for promoting Guarilia and not Michaud.

 Therefore, the burden remains with Michaud to demonstrate by a preponderance of the evidence that Leslie Fay's decision not to promote her was motivated by her gender. Ms. Kishbaugh's testimony that the head of engineering said that "as long as present management is in place, there will never be another woman manager," is not direct evidence of discriminatory bias. There was no evidence that the speaker had any input in the decision to promote Guarilia. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (Inferences of intentional discrimination may not be based on "statements by nondecision makers, or statements of decision makers unrelated to the decisional process itself ..."). Even assuming that the *Price Waterhouse* burden of persuasion shifted to the defendants, I am convinced that Michaud was not promoted because of her inability to take orders and to compromise with other managers, a perceived requirement of the position for which she was passed over. I do not believe it more likely that this particular female—Michaud—did not get the job because she was female.

### 2. *Michaud's Claim of Disability Discrimination*

The ADA prohibits an employer from discriminating against an employee "because of the disability of such individual in regard to application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). As defined in the ADA, "Discrimination" includes:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business....

42 U.S.C. § 12112(b)(5)(A). To establish a *prima facie* case of disability discrimination, a plaintiff must show that (i) she is an individual with a disability; (ii) she is qualified to perform the essential functions of the job; and (iii) the employer had notice of the plaintiff's disability and failed to provide reasonable accommodation. *Lyons v. Legal Aid Society,* 68 F.3d 1512, 1515 (2d Cir.1995). Michaud contends that Leslie Fay failed to reasonably accommodate her disability, subjected her to a hostile work environment and eventually constructively discharged her because of the harassment unleashed on her by her supervisor, Joseph Guarilia. I'll take each assertion in turn.

■ Michaud's testimony that she has diabetes which requires insulin shots on a daily basis, frequent trips to the ladies' room, and the need for constant maintenance of her sugar level, establishes that she has a disability within the meaning of the ADA. *See Canon v. Clark,* 883 F.Supp. 718, 721 (S.D.Fla.1995); 42 U.S.C. § 12102(2). Leslie Fay does not dispute her disability nor does it dispute that Michaud was qualified for her position. Her testimony as to her qualifications meets this burden without objection. *See Wernick v. Federal Reserve Bank,* 91 F.3d 379, 384–85 (2d Cir.1996); *Borkowski v. Valley Central School District,* 63 F.3d 131, 137 (2d Cir.1995); *Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 514–15 (2d Cir.1991), *cert. denied,* 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992).

■ The term "reasonable accommodation" means making existing facilities accessible and creating a work place which allows a person with a disability to perform the essential functions of the job or allows a person with a disability to enjoy the same benefits and privileges as an employee without a disability. Leslie Fay has demonstrated that it provided Michaud with reasonable accommodation by providing her with an air conditioned office with a desk and chair, allowing her to eat lunch on time, and making available a porter to carry garments. Guarilia himself told Michaud to ask others to carry the garments. Leslie Fay instructed her to sit and let the examiners bring their questions to her. Michaud contends, however, that once Joseph Guarilia became her immediate supervisor, he threatened to take away her service porter, interrupted her lunch hour, refused her access to her office, and laughed when he witnessed her struggling with garments. Given that there is no dispute that Leslie Fay provided the reasonable accommodation and these issues that Michaud raises all go to whether Michaud's immediate supervisor created a hostile work environment, harassed her, or succeeded in constructively discharging her, Michaud's allegations are all more appropriately taken up in the next section pertaining to Leslie Fay's liability for Guarilia's alleged harassment. So it is to the law on harassment that we now turn.

That from "time to time" both Guarilia and Granahan would interrupt her lunch hour to talk about work does not lead me to conclude that Leslie Fay did not accommodate Michaud's disability. With the pace of the examining function as it was, it is not difficult to believe that sometimes management had to speak with Michaud while she was eating. Moreover, she never had a complaint about Lewkowiez's lunchtime work discussions. Michaud's disability did not require she eat on time in silence, only that she be permitted to eat when required, and she was never prevented from that.

Hostile environment and constructive discharge claims are unlike the majority of discrimination claims in that no single act is the sole subject of the allegation. *Smith v. Kmart Corp.,* No. CS 95–248, 1996 WL 780490, * 7 (E.D.Wash. Dec. 18, 1996). Rather, it is the continuation of the hostile working environment and the resulting constructive discharge that constitute violations of the ADA. *See id.*

> A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.

*Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Meritor Sav. Bank. v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *see Hendler v. Intelecom USA, Inc.,* 963 F.Supp. 200 (E.D.N.Y.1997) (recognizing hostile work environment discrimination in ADA context); *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092 (S.D.Ga.1995) (same).

The elements of a hostile work environment discrimination claim are:

(1) plaintiff belongs to a protected class;

(2) plaintiff was subject to unwelcome disability harassment;

(3) the harassment was based on plaintiff's protected status; and

(4) the harassment affected a term, condition, or privilege of employment.

**790**

See generally *Cosgrove v. Sears Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir.1993).

The United States Supreme Court has recognized a claim for hostile work environment even in the absence of an economic affect on the complainant's employment. *Meritor Sav. Bank,* 477 U.S. 57, 106 S.Ct. 2399. The Fifth Circuit in *Jones v. Flagship Int'l* recognized that a plaintiff's psychological well being is a term, condition or privilege of employment within the meaning of Title VII. 793 F.2d 714, 720 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *see also Dortz v. City of N.Y.,* 904 F.Supp. 127 (S.D.N.Y.1995).

"A plaintiff seeking to establish harassment under a hostile work environment theory [however] must demonstrate some specific basis to hold the employer liable." *Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). "[E]mployers are not always liable for the hostile work environment created by their employees, ... [but] the lack of notice and the existence of complaint procedures do not automatically insulate an employer from liability." *Id.* at 779.

It is clearly relevant if the alleged harasser is the plaintiff's supervisor rather than her co-worker, although such a distinction will not always be dispositive. *Id.* 779–80. The level of the supervisor in the hierarchy within the company and whether there is a reasonable avenue open for complaint will be considered. *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir. 1992). The Second Circuit has held that an employer is liable for the discriminatory abusive work environment created by a sufficiently high level supervisor if he is aided in accomplishing the harassment by the existence of the authority entrusted to him by the employer. *See Karibian,* 14 F.3d at 780.

■ That Guarilia made Michaud's work environment unpleasant is well supported in the record. Nonetheless it is not actionable unless the harassment, intimidation, ridicule, and insult was based on her sex or disability and was sufficiently severe and pervasive that it altered the conditions of Michaud's employment. Moreover, the employer is not liable unless the plaintiff demonstrates some basis upon which to hold the employer liable for the actions of its employees. *See Karibian,* 14 F.3d at 779; *Kotcher,* 957 F.2d at 63.

■ Verbal assault on account of a person's disability constitutes actionable hostile work environment harassment under the ADA when the harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *See Haysman,* 893 F.Supp. 1092; *see also Burger,* 1996 WL 421449, at *10 n. 9, 1996 U.S. Dist. LEXIS 5560, *29 n. 9. Remarks concerning the plaintiff's disability may be evidence that discrimination was an impetus to her supervisor's actions although they do not compel that conclusion. *See generally Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995); *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577 (2d Cir.1989).

■ Not only must the plaintiff subjectively feel that the work environment is hostile due to a protected characteristic, the environment must in fact be objectively hostile. *Crawford v. Medina General Hospital,* 96 F.3d 830, 835 (6th Cir.1996); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The fact finder must consider the totality of the circumstances and may consider factors, such as:

> The frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris,* 510 U.S. at 23, 114 S.Ct. at 371; *Cosgrove,* 9 F.3d at 1042; *Kotcher,* 957 F.2d at 62; *Carrero,* 890 F.2d at 577.

Michaud's own testimony demonstrates that many of the disagreements she had with her supervisors related to her performance regarding the implementation of the new audit system and her perceived insubordination—not to her sex or disability. *See Michaud,* Tr. 842, 853–54 (June 23, 1997). The

new audit system required that the examiners inspect fewer garments, so it is conceivable that substandard dresses were indeed "being pushed through without examination." That Michaud was quality conscious is commendable, but if her supervisors instructed her to let the garments go, she was under an obligation to do so, especially after her complaint to Cawley in this regard led to reprimand. If Leslie Fay's new system would result in poorer quality and more returns, that was Leslie Fay's problem and not Michaud's. Michaud predicted that Guarilia would then blame her for the returns, which if true, would certainly be unfortunate and unfair. However, without more, it would not be actionable under the discrimination statutes. *See Shabat v. Blue Cross Blue Shield,* 925 F.Supp. 977, 981–82 (W.D.N.Y.1996), *aff'd,* 108 F.3d 1370 (2d Cir.1997); *Monica v. New York City Off–Track Betting,* 93 Civ. 6371, 1995 WL 117879 at *6, 1995 U.S. Dist. LEXIS 3350 at *15 (S.D.N.Y. Mar. 20, 1995) (allegations of unfair criticism and objections to management decisions, combined with conclusory allegations of harassment, do not show constructive discharge); *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360–61 (2d Cir.1993); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (employee was not constructively discharged where she was required to train another employee to take over as her supervisor, without any loss in pay or title). And given Michaud's strong backbone, I doubt whether she would have let Guarilia's predicted reaction go unanswered to his supervisor. Michaud recounted a series of disagreements with Guarilia about matters unrelated to sex or her disability, most notably Guarilia's shipment of inferior merchandise and his undermining her in front of the examiners by taking the stickers off dresses and complaining that she was putting too many on. Michaud was also upset that Guarilia would pit the examiners against her. That Guarilia once slammed his hand on the desk and rhetorically inquired,

"Do I have to beat you for you to understand that it is what I say and not what you say[?]" while unbecoming, is not actionable hostile work environment discrimination because it was an isolated comment and because I found persuasive the testimony regarding Michaud's refusal to embrace the new audit procedures. This appears to have been an isolated comment from a frustrated supervisor, rather than sexual or disability harassment. Moreover, Michaud baited Guarilia in front of the examiners, dishing out to him much of what she received·from him. Without a doubt, she and Guarilia were engaged in a mutual contest of wills. But he was not alone in his negative behavior.

Notwithstanding that the majority of Guarilia's problems with Michaud appear to be business related insofar as Guarilia perceived Michaud as insubordinate, it was unrebutted that Guarilia also used Michaud's disability to demean her. Michaud has demonstrated that Guarilia would laugh at her when she complained about factors she believed detrimental to her health (for example, her having a full lunch hour). She has also testified that although Guarilia told her to use the porter to carry garments, he would laugh when he saw her struggling and trying to carry them herself. He also wondered aloud why, if she was "so damn sick ", she didn't just leave. She says he also threatened to take her service porter away and told her she could not use her office except for lunch and breaks.

■ Whereas at least some of what Michaud testified to as being harassment probably does not qualify because some of the items suggest more of a personality clash and a battle of wills, the critical question is not so much whether Michaud found the latter category of actions (in the paragraph immediately above) subjectively hostile [17] and whether a reasonable person in the same circumstance would agree, but rather whether Leslie Fay may be held liable for Guari-

---

17. While not meaning to belittle Guarilia's cruel comments about her disability or his threats to take away the service porter, it appears that Michaud's complaints about the "time to time" interruptions during lunch were probably not sufficiently pervasive to qualify as harassment. Lewkowiez, her prior supervisor with whom she

undoubtedly had a better relationship, testified that she never complained when he "often" interrupted her lunch hour for work discussions. He also saw her carrying garments on more than one occasion, without complaint. She appears to have become significantly more sensitive with the promotion of Guarilia.

lia's actions. In this vein, it is plain from the testimony of Michaud, as well as of Granahan, that Michaud was not a timid woman. For example, even though her new parking space (which was 14 spots in from the door) was closer to the door than her old one, she testified that the fact that it was two spaces in from where the gravel started (while Guarilia's was just three in from the door) was "important to [her]" so she complained to both Guarilia and his supervisor, Granahan. She also felt very strongly about what she perceived as the lower quality assurance resulting from the new audit procedures. Her complaints were not confined to her supervisor, for she also went above his head, and over the head of *his* supervisor, to the Vice President of Leslie Fay's domestic manufacturing, to let it be known that Leslie Fay was cheating its paying customers. Her suggestion that Granahan and Guarilia's three hour lecture regarding chain of command somehow dissuaded her from complaining to Cawley about harassment is not credible. Shortly after that conversation, she again spoke with Cawley about Guarilia's and Granahan's failure to give her a raise. She also asked Cawley for a transfer. Other things she deemed important enough to complain about include: Leslie Fay's proposing to sell items not worthy of sale notwithstanding the CFO's orders to do so; Guarilia's undermining her in front of the examiners; being interrupted during lunch; and the lack of air for the examiners in the examining area. She also requested to be laid off or transferred three times in four months. However, Michaud never complained about Guarilia's alleged forcing her out of her own office, failing to accommodate her disability, or harassing her.

Michaud obscurely testified that she complained to Granahan "to tell him this whole thing, about how Joe slammed the desk, and he upset me so badly many times." Michaud, Tr. 851 (June 23, 1997). Granahan testified that Michaud never complained that Guarilia was harassing her or not accommodating her disability. The testimony is not inconsistent. It is not clear from Michaud's testimony that she complained to Granahan about anything other than the fact that Guarilia slammed the desk and asked, "Do I have

to beat you to understand that it is what I say and not what you say[?]" This complaint alone does not prove that Michaud informed Granahan about harassment or being denied reasonable accommodation for her disability. I would be hard pressed to presume that Michaud complained to Granahan about disability harassment; it is Michaud who carries the burden of proof.

Michaud also testified that she complained to Cawley that she could not stand to work for Guarilia anymore because it was ruining her health. Cawley denies that Michaud ever complained that Guarilia was abusing her. Again, the testimony is not inconsistent. In light of Guarilia's obvious displeasure with Michaud's work performance (the way she would teach her staff, the numbers they were getting out, her speaking to the factories about their request for more stickers, etc.) and his taking her stickers off dresses and shipping them without repairing them, when she strongly believed that they ought be repaired, Michaud probably felt he was ruining her health. Michaud, who had been at Leslie Fay for a long time, was accustomed to running the examining department and to having the final say as to what went out and what did not, was suddenly being told that her opinion no longer counted if Guarilia disagreed with it. That her blood and sugar level increased as a result of working for Guarilia is not actionable unless his action related to her disability, and moreover, Leslie Fay can not be held liable unless Michaud demonstrates a basis upon which to find Leslie Fay at fault.

Michaud has proven herself sufficiently tough that I believe that if she was really denied access to her office, was forced to stand, or was subject to pervasive disability harassment, it would have been sufficiently "important to her" that she would have complained to Granahan at the least, but even more likely to Cawley. When Michaud complained to Cawley about the "bad quality imports," without even first approaching Granahan with her concerns, Granahan told her quite clearly that she should go to him first if Guarilia were unresponsive to her complaints. Not only did Michaud not go to Granahan about Guarilia's alleged threats

and harassment but she did not go to Cawley either. And, of course, she did not complain to the Human Resource Department. Under these circumstances, I conclude that Michaud failed to pursue available reasonable avenues to complain about the alleged harassment. Thus she cannot succeed in holding Leslie Fay liable for the mistreatment of its low level supervisor, Guarilia, particularly since there is no convincing evidence that Guarilia used whatever small authority he had to effect changes in Michaud's working environment. She still used her office and porter and she still had regular lunch times and breaks. His unreported demeaning of her physical condition is insufficient to foist liability on Leslie Fay, for his snide comments could just as easily have been made by a co-worker as a supervisor; in other words, he did not use his position to abuse her. *See Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59 (2d Cir.1992) (holding that employer not liable for hostile work environment caused by plaintiff's low-level supervisor absent notice or the failure to provide a reasonable avenue for complaint).

Because Michaud has not shown that Leslie Fay is responsible for Guarilia's actions, she has simultaneously failed to prove that she was constructively discharged due to her disability. *See Stetson v. NYNEX Serv. Co.,* 995 F.2d 355 (2d Cir.1993); *Pena v. Brattleboro Retreat,* 702 F.2d 322 (2d Cir.1983); *Stewart v. Weis Markets, Inc.,* 890 F.Supp. 382 (M.D.Pa.1995); *Chisholm v. Foothill Capital Corp.,* 940 F.Supp. 1273, 1282 n. 3 (N.D.Ill.1996).

### Conclusion

For all of the reasons discussed above, none of the plaintiffs is entitled to a recovery. SETTLE ORDER.